Mulco Products, Inc. (formerly John H. Mulholland Co.), a corporation of the State of Delaware, Petitioner Below, Appellant, v. Howard W. Black, Respondent Below, Appellee.

(*December* 18, 1956.)

SOUTHERLAND, Chief Justice, BRAMHALL, Justice, and HERR-MANN, Judge, sitting.

*Aaron Finger* (of Richards, Layton and Finger) for appellant.

*William H. Foulk* and *William Duffy, Jr.*, for appellee.

Supreme Court of the State of Delaware, No. 27, 1956.

SOUTHERLAND, C. J.:

This case concerns the validity of a judgment note given to Black (respondent below) by the Vice President and General Manager of John H. Mulholland Co. (the corporation), in the name of the corporation, purporting to evidence the corporation's indebtedness to Black in the sum of $25,000. The trial court, on the corporation's petition to open and vacate the judgment, held the note and judgment to be valid.

The essential question before us is whether a crucial finding of fact by the trial judge—a finding that the $25,000 represented a loan to the corporation for corporate purposes—is supported by any competent evidence. The corporation urges that it was so clearly wrong that it was arbitrary and cannot stand. The corporation also raises certain subsidiary questions. Because of the nature of the principal question a full statement of facts must be made.

The events that concern us took place in 1953. At that time and for many years before the corporation was engaged in the manufacture and sale of wooden spoons. Its president was Harry H. Mulholland, whose family owned about 60% of the stock. Its executive vice president and general manager was Clarence M. Welch, Jr., who owned about 40% of the stock. The active man-

agement of the corporate affairs was entrusted to Welch, who had been in the corporation's employ for many years. Whether he was a general manager only, or in effect "was the corporation" because of abandonment of control by the directors, is in dispute. In the view we take of the case, it is unnecessary to review the findings below on this point.

Sometime prior to March 1953, Welch availed himself of his power to sign corporate checks to withdraw from the corporate funds large sums of money for his own benefit. Learning of this, Mulholland put into effect a change intending to insure a measure of control over Welch's right to sign corporate checks, but the depositing bank was not advised of this change. Welch acknowledged his irregularities and promised to do all he could to repay the sums taken. During the following month he did pay back a substantial amount.

During the month of June Welch repeated his offense. He secretly drew checks to his order aggregating $17,700. As June 30 approached, discovery of his withdrawals became imminent, since the monthly bank statements would disclose them. Welch took steps to replace the money.

Welch had a friend of many years' standing—Howard W. Black, the respondent below. Welch had on several occasions borrowed money from Black, always for his personal uses and always evidenced by his personal obligations. Black had been for thirty years a salesman for the corporation and also had other interests. He was entirely familiar with Welch's rise in the corporation to his position of active management. He regarded Welch, in effect, as the corporation.

During the last week of June Black received a telephone call from Welch at Black's Michigan office. The testimony of Black and Welch detailing the conversation that followed is in conflict. The trial judge, who saw and heard both witnesses, accepted Black's version. It is as follows:

"Howard, how are you fixed for money?, and I said, 'Well I have a little. Why do you ask?!, and he said, 'As you know,

we have arranged with, I think it was Harriman, Ripley, the company is going to buy out Harry Mulholland, but the company is going to buy—borrow this money to buy this stock, and we have some machinery to be paid for and we have quite a few debts I would like to clean up right away. How much can you loan me?', and I said, 'Well, the cherry season is very close to here and I am going to need all of my money in a short time to buy cherries,' and he said, 'How much could you spare me for thirty days?', and I said, 'About, maybe, $15,000 or $20,000 or $25,000, but for 45 days, at the outside,' and he said, 'Well, this is a company deal and I will send you a company note for $25,000, and will it be all right to make it for 45 days?', and I said 'Yes' ".

This is the crucial finding of fact we have above mentioned. The trial court's acceptance of Black's testimony is vigorously assailed by the corporation. Its contentions with respect thereto will be hereafter considered.

After the telephone conversation Welch mailed to Black a judgment note, payable to Black, in the amount of $25,000 with interest at 6%, dated June 29, 1953, and payable 45 days after date. It was signed "John H. Mulholland Co.—C. M. Welch, Vice President and Treasurer". The note was received in Black's office on the morning of June 30. Black's secretary, Mrs. Ferne M. Fry, had been told by Black to expect it. Black, who was out of the office, telephoned Mrs. Fry during the morning. She told him that the note had come in and asked him what to do about it. Mrs. Fry testified: "He told me to draw a check, to send him a check immediately, and he dictated a letter to me over the telephone to accompany it." Mrs. Fry had authority to sign checks on Black's account. She drew a check of the Howard Black Cherry Co., in the sum of $25,000, dated July 1, 1953, to the order of "C. M. Welch". This check she enclosed in a letter written to "Mr. Clarence M. Welch, John H. Mulholland Company, Milford, Delaware". The letter mailed July 1 said in part: "I do want to caution you that we shall need the money at the

expiration of this note". The letter and check were enclosed in an envelope marked "Personal".

Mrs. Fry was asked why the check was made payable to Welch. She replied:

"I assume that probably is an error on my part. Mr. Black was just in the habit of telling me to do things. He said, 'Write *them* a check and send it out' with the letter that he dictated to me, and I assume that it was a misunderstanding on my part." [Italics supplied.]

Asked on cross-examination: "When Mr. Black told you to send him a check, who were you referring to by 'him'?", she replied: "Mr. Welch".

Without waiting for the arrival of Black's check, Welch made out a duplicate deposit ticket, purporting to evidence the deposit on June 30 by John H. Mulholland Co. of $25,000. Under the heading "Checks as follows" he wrote "C.M.W.". This ticket was delivered to Donohoe, the bookkeeper. Under Welch's instructions, Donohoe entered the item in the Cash Receipts Book under date of June 30 as having been received from "C.M.W.". When Donohoe received the bank statement he discovered that the deposit had not been made on June 30 and crossed out the entry. Later, under instructions from Welch he made another entry in the Cash Receipts Book, again under date of June 30, showing the receipt of the $25,000.

On the same day, June 30, Welch told Mulholland that he (Welch) had deposited $25,000 to the credit of his personal account. The amount was credited to his personal drawing account on June 30, with the notation: "Check from Black".

Welch received Black's check July 2 and on that date deposited it in the corporation's bank account. It was endorsed: "C.M.Welch—For Deposit Only The First National Bank and Trust Co.—John H. Mulholland Co.".

Before the making of this deposit the corporate bank account, depleted by Welch's withdrawals, was insufficient to meet

the payment of outstanding checks drawn to pay corporate debts. These checks would have overdrawn the account by about $17,000.

During July Welch once again secretly withdrew corporate funds for his personal benefit amounting to $9,500. These abstractions came to light when the July bank statement was received. Mulholland called Welch, who said that he was ashamed to talk to Mulholland, and would "stay out" until he could get the money to buy Mulholland's stock "or quit". Welch was away from the company from that time until September 29th.

Black's note fell due on August 13. Shortly thereafter he received a telephone call from Welch. Welch asked Black to meet him in Detroit a day or two later. At this time, as above stated, Welch was out of the corporation. Black testified, respecting the telephone call: "I thought at that time that he was going to pay the note."

Prior to the Detroit meeting Black knew that Welch was seeking to buy the Mulholland stock. Black had been kept reasonably well informed of the negotiations. At the Detroit meeting Welch explained that the deal had not yet been consummated, but he expected to complete it "at almost any time." He then asked Black if Black would be interested in buying some stock. Black said he would take 20 per cent. Black testified: "So we figured out that I would then apply this $25,000 plus an $8,000 check which I subsequently sent for the stock." This $8,000 check Black made out to the corporation. Welch tried to deposit it in his own account, but the bank would not permit this and Black drew another check to Welch personally. Black testified that this understanding with Welch about the purchase of the stock was "firm".

On September 30, Welch, who had for some time been seeking to buy the Mulholland stock in the corporation, consummated the purchase of the stock, financing it through a loan at the Farmers Bank secured by the stock.

Toward the end of October Mr. Baldwin of the Farmers Bank made inquiry of Welch concerning some discrepancies in the corporate affairs. Welch then disappeared, and the bank subsequently foreclosed on its collateral and took over the management of the corporation.

No stock was ever actually issued or delivered to Black in accordance with his understanding with Welch.

The note by its terms matured August 13, 1953. Black made no demand at maturity for payment of principal or interest. Neither Mulholland, the president of the corporation, nor Donohoe, who was in charge of the books, had any knowledge of the existence of the note to Black until early in November, when Mulholland telephoned Black to inquire concerning Welch's whereabouts, and was told that Black held the corporation's note for $25,000. No entry reflecting a corporate obligation to Black was ever made on the books.

On November 16, 1953, Black caused judgment to be confessed on his note in the Superior Court of Sussex County. He gave no notice to the corporation of this action. On December 17 Baldwin wrote Black inquiring concerning any borrowings of him by the company. Black replied describing the $25,000 note.

On May 9, 1955, the corporation filed a petition to vacate the judgment on the ground (1) that the loan was a personal loan to Welch, and no consideration passed to the corporation, and (2) that Welch had no authority to make the loan.

The trial judge ordered the judgment opened and set the case down for hearing on the merits. It was heard by the court sitting without a jury, on oral testimony and depositions. The court rejected all the corporations's contentions. It held: (1) that Black's $25,000 check represented a loan to the corporation and not a loan to Welch personally; (2) that Welch was the alter ego of the corporation and had implied and also apparent authority to borrow money for corporate purposes; (3) that payment of the money by Black to Welch constituted construc-

tive payment to the corporation; and (4) that the circumstances of the Detroit meeting did not show a novation, or release the corporation from liability on its note. He accordingly dismissed the petition. The corporation appeals.

In seeking to overturn the findings of the trial judge, the corporation renews the contentions made below. For convenience, we restate them as follows:

1. The loan from Black to Welch was a loan to Welch personally for the latter's own use, and was not in fact intended as a loan to the corporation.

2. The execution and delivery of a corporate obligation to Black did not make the loan a corporate loan, because Welch had no implied or apparent authority to borrow the money.

3. The proceeds of the loan were not used for corporate purposes, but for Welch's own purposes, *i. e.*, to reduce his indebtedness to the corporation, and the corporation never received *from Black* the proceeds of the loan.

4. The understanding between Welch and Black at the Detroit meeting was in law a novation, and the corporate liability for the note, if any, was extinguished.

The first contention raises what we think is the crucial question in the case. The corporation contends that the evidence that the loan was a personal one is so overwhelming as to make the trial court's finding to the contrary arbitrary and unreasonable.

The details of the evidence upon this question are set forth above. The trial court found that the preponderance of the evidence showed that the loan was a corporate one. This finding was obviously based on the acceptance by the court of Black's version of his telephone call from Welch, and upon the rejection of Welch's testimony, which the trial judge found to be so contradictory as to rob it of all credit. Obviously, we cannot say that such a finding was arbitrary or unreasonable. It is sustained by competent evidence that the court found to be trustworthy.

The corporation argues, however, that "actions speak louder than words", and that Black's conduct compels the conclusion that his version of the telephone conversation, which is said to be unsupported, should be rejected.

First, it is argued that Black's drawing of the check to the order of Welch personally, and mailing it to Welch personally, indicate a personal loan. Ordinarily this argument would have force, but the drawing of the check in that form was explained by Black's secretary as a mistake on her part, and the court accepted this testimony. Again, we cannot say that this finding was arbitrary. And this evidence not only explains the drawing of the check but tends to corroborate Black's testimony of his understanding of the nature of the loan.

It is next said that Black's failure to demand payment of the loan from the company upon maturity suggests that he did not consider it a corporate obligation. In explanation of this Black testified that the cherry crop was bad and that, contrary to expectation, he did not need the money in the middle of August.

Emphasis is put upon Black's statement, when Welch asked him to come to Detroit, that "I thought at that time that he [Welch] was going to pay the note". Since Welch was out of the company at that time—a fact, it is said, that Black must have known—his supposition indicates that he regarded the loan as a personal one. It is said, finally, that when Black at the Detroit meeting agreed to use the note in payment of his purchase from Welch of stock in the reorganized company, he again acted as though the note were Welch's personal obligation. These circumstances may have some force, but they are explicable on the theory that Black knew that Welch was intending to buy out the Mulholland interests, and hence thought the distinction between Welch and the corporation of little consequence. Whether he was right in this is of no importance. The point is that, whatever force these circumstances have, it is clearly insufficient to justify us in holding that the crucial finding of the trial judge was either arbitrary or clearly unreasonable.

■■■ The findings of the trial judge, sitting in the Superior Court without a jury have the effect of the verdict of a jury, and will not be disturbed by this Court if there is competent evidence to sustain them. *Turner v. Vineyard*, 7 *Terry* (46 *Del.*) 138, 80 *A.* 2d 177. The applicability of that rule to this case is not challenged. The contention of the corporation is, as above stated, that the finding of the trial court was so clearly unreasonable as to require us to find that there was no competent evidence to sustain it. The review of the evidence above made shows clearly that the trial judge's finding was based upon competent evidence to which he gave credence, and that the evidence claimed to require the contrary finding falls far short of attaining the overwhelming effect claimed for it. We cannot, therefore, disturb that finding.

The corporation's second and third contentions may be conveniently considered together. By these contentions we understand the corporation to argue that even if the parties intended the loan to be a corporate one the corporation is not liable, because Welch had no authority to borrow the money, and the corporation never received *from Black* the proceeds of the loan.

■■■ We pass over the question of authority, because even if authority were lacking yet if the corporation received and retained the fruits of the loan it is estopped to deny authority in Welch to borrow the money. This principle is settled beyond question. *Fletcher, Cyc. Corp'ns*, § 773; *Hannigan v. Italo Petroleum Corp'n*, 4 *Terry* (43 *Del.*) 333, 47 *A.* 2d 169.

■■■ Now, the Black check to Welch was deposited in the corporate bank account as soon as received. The fact that Black drew the check to Welch personally was a careless act. But Welch dealt with the check just as he would have been bound to deal with a check properly drawn to the order of the corporation. The corporation received and retained the money, and the rule above quoted applies. The argument that the proceeds were not received from Black is based also on the false book entries reflecting a credit to Welch's personal account. But

Welch's juggling of the books is immaterial, since Black was not shown to have any knowledge of it.

The corporation argues that Black put it in Welch's power to commit a fraud and appropriate the proceeds of the check. So he did; and if Welch had cashed the check and converted the proceeds to his own use, a wholly different situation would confront us. But he did not do so.

Nor did the drawing of the check to Welch personally enable him to commit the fraud that he did commit. His power and opportunity to cause false book entries to be made derived from his position in the corporation. That position would have enabled him to commit such a fraud even if the check had been drawn to the order of the corporation.

For the reasons above given, the second and third contentions of the corporation must be rejected.

There remains for consideration the corporation's fourth contention—that there was a novation by reason of the understanding at the Detroit meeting. The trial judge found that neither Black nor Welch contemplated that the corporation should be relieved of liability upon its note until Black should have received the stock. This finding is clearly based upon competent evidence. It is said that the parties had a "firm" understanding. So they did, apparently, but what was the understanding? Referring to his payment of $8,000 to Welch, Black testified: "It was to apply on stock, if and when the stock was issued by the new company". As to the $25,000 Black testified that it was to apply "if and when the company was established". We think the trial judge was fully justified in concluding that the consummation of the stock purchase depended upon the actual delivery of the stock. Hence we should not disturb his conclusion that there was no novation.

For the reasons above stated, the order below must be affirmed.