S-W COMPANY, Plaintiff and Respondent, *v.* FRED E. SCHWENK, Jr., Pacific National Bank of Washington and Shell Oil Company, Defendants and Appellants.

No. 13422.
Submitted May 31, 1977.
Decided Aug. 17, 1977.
568 P.2d 145.

Denzil R. Young argued, Baker, for defendants and appellants.

Berger, Anderson, Sinclair & Murphy, Arnold A. Berger argued, Billings, for plaintiff and respondent.

Fillner & Pitet, Patrick G. Pitet argued, Billings, for amicus curiae.

MR. JUSTICE SHEA delivered the opinion of the Court.

Fred E. Schwenk, Jr., appeals from an order of the district court granting summary judgment for S-W Company and from the denial of the district court to amend the court's findings of fact and conclusions of law.

The action is on a contract involving interests in land in Fallon County. S-W Company, a promisor to the contract, brought the action against Schwenk, Pacific National Bank of Washington and Shell Oil Company, promisees. The latter two parties are stakeholders who do not join Schwenk on appeal. John Wight was a copromisor on the contract. He was not made a party to the action but filed a brief on leave of this Court as amicus curiae on appeal after receiving notice of the judgment of the district court. On appeal Wight requests joinder as an interested party to the action.

In settlement of a former dispute, Schwenk agreed to accept the sum of $15,000 as full payment to him for his interest in the particular lands described in the agreement with S-W Company and Wight. The agreement stated:

"First Party [Schwenk] shall accept the sum of Fifteen Thousand ($15,000.00) Dollars as full payment to him for his right, title, interest and claims in to the above described lands and working interest embracing those lands, which shall be paid in the following manner: One-half of the net proceeds derived by S-W Company from its working interest in and to said lands, and one-half of the net proceeds to be derived from the Wight Trust interest held by the First National Bank of Denver embracing the said described lands." (Bracketed material added.)

According to the agreement, instruments regarding the interests in the land were to be held in escrow and delivered to S-W Company "when the terms and conditions of this agreement and the escrow agreement have been complied with fully."

Shell Oil, the producer of oil from the lands, later made monthly payments towards the $15,000 debt, applying one-half the monthly income fo S-W Company. Wight Trust funds, meanwhile, were indefinitely impounded by another unrelated lawsuit. When more than $7,500 had been paid to Schwenk by income from S-W Company, S-W Company sued Schwenk, the Bank and Shell Oil alleging that it had fulfilled its obligations of the agreement. Schwenk answered, alleging that the agreement did not limit S-W Company's obligation to one-half of the $15,000 debt, and that instead, S-W Company was jointly and severally liable for the whole amount. Wight, the cosigner on the debt, was not joined or notified of the proceedings until after judgment. Neither party to the action nor the court raised the question of joinder prior to appeal.

The only evidence submitted to the court for interpretation was a copy of the agreement itself. The trial court granted a motion of S-W Company ruling that the language in dispute was not ambiguous and accordingly that S-W Company was liable to pay only $7,500 of the $15,000 debt. After the trial court refused to amend any of its findings and conclusions, Schwenk appealed from the granting of the summary judgment.

Schwenk's appeal raises three main issues:

1. Was the district court in error in determining there was no ambiguity in the contract?

2. Did issues of fact exist which precluded the granting of summary judgment?

3. Should the district court have required the joinder of Wight as an interested party whose interests were affected by the judgment?

If the district court was correct in determining that the disputed language was not ambiguous, it would follow that there were no material questions of fact as to the liability of S-W Company. However, we determine that the language is ambiguous and accordingly that there were material facts in dispute.

■■ Where ambiguity does exist on the face of the contract, the question of the parties' intent as to the language involved is submitted to the trier of fact. *Shell v. Peters*, 147 Mont. 21, 410 P.2d 152. Ambiguity exists when a contract taken as a whole in its wording or phraseology is reasonably subject to two different interpretations. *Watson v. Barnard*, 155 Mont. 75, 82, 469 P.2d 539. Here, the crux of the case is whether S-W Company is jointly and severally liable for the total $15,000 debt, or only severally liable for half, $7,500. The only language in the agreement relating to liability is phrased in terms of the source of funds to pay the debt:

"One-half of the net proceeds derived by S-W Company from its working interest in and to said lands, and one-half of the net proceeds to be derived from the Wight Trust interest * * *."

What was meant by this language? Does it mean that the S-W Company is liable to pay only $7,500 as the trial court held, or does it mean that one-half of the net proceeds (however large or small that amount may be) of the S-W Company's working interest in the land involved, shall go towards payment of the $15,000 debt? Similarly, does it mean that one-half of the net proceeds of the Wight Trust (however large or small that amount may be) shall go towards payment of the $15,000 debt? We cannot conclude as a matter of law that the meaning of this contract language was clearly stated or unambiguous.

Nowhere in the agreement is the extent of each promisor's liability defined other than to the extent of one-half of each source of income. There are no time limitations, furthermore, on payment from either S-W Company or Wight Trust; documents in escrow were to be released only after the agreement was fully performed.

Under Montana law, obligations imposed upon several persons may be (1) joint, (2) several, or, (3) joint and several. Section 58-201, R.C.M.1947. Section 58-202, R.C.M.1947, states:

"*When joint and several.* All joint obligations and covenants

shall hereafter be taken and held to be joint and several obligations and covenants."

Sections on the interpretation of contracts, sections 13-725 and 13-726, R.C.M.1947, raise the presumption of joint and several liability. They provide:

Again, there is nothing in the contract as it pertains to sick leave wherein 260 is interjected into the formula to establish the sick leave. While the sick leave provision clearly contemplates having *every administrator* of the School District come under its coverage, a casual look at the clause pertaining to vacations, Article XXVII, specifies that it only applies to administrators employed on a twelve-month basis.

If the School Board desired to have the formula for twelve-month employees based on 260 rather than 190, obviously the place to bring this up was at the bargaining table.

The School District wants this Court to interpret the sick leave clause in such a way as to give effect to its position which, up to the time in question, it has been unsuccessful in accomplishing through the collective bargaining process. The courts have no power to make contracts for parties. *Horst v. Staley*, 101 Mont. 543, 54 P.2d 876; *Reeves v. Littlefield*, 101 Mont. 482, 54 P.2d 879. The language of the contract is clear and unambiguous, and the courts have no authority to change the contract or disregard the express language used. *Williams v. Insurance Co. of North America*, 150 Mont. 292, 434 P.2d 395. This Court is not at liberty under the guise of construction to alter the contract of the parties. *Ryan Mercantile Co. v. Great Northern Railway Co.*, D.C., 186 F.Supp. 660, affirmed 9 Cir., 294 F.2d 629. In the interpretation of contracts, the language employed must be given its ordinary meaning. *Quirk v. Rich*, 40 Mont. 552, 107 P. 821. There are no inconsistencies in the contract clause in question. There are no ambiguities in question. The clause is clear. Driscoll was to receive retirement pay as decreed by the district court.

The School District attempted to justify its rationale by premising its argument on a survey of Montana administrative salaries.

The court properly sustained the objection of Driscoll that this exhibit was not relevant to the issues here.

The School District erroneously relies upon *Zderick v. Silver Bow County*, 154 Mont. 118, 460 P.2d 749, for the proposition that it had no authority to enter into a contract for sick leave or severance pay. That case involved a county, not a school district, and held that because, in 1969, the legislature had not get granted to county commissioners the authority to contract over the subject matter, to-wit: the accumulation of unused sick leave to be used as severance pay, the particular clause was to be stricken. In 1973 the state legislature enacted into law Title 59, Chapter 16, R.C.M. 1947, granting all public employers the right to bargain collectively with their employees over rates of pay, hours, fringe benefits and other conditions of employment. Sections 59-1601 through 59-1617, R.C.M.1947. However, since 1971 school districts have had the authority to enter into binding collective bargaining contracts over such matters. Sections 75-6115 through 75-6128, R.C.M.1947 (repealed 1975). *Zderick* mandated the legislature must act in this area before such a clause could be enforced, and that is precisely what the legislature has done.

Additionally, in 1974 the state legislature enacted Chapter 374, Montana Session Laws, which amended section 68-1602, R.C.M. 1947. That particular law concerns the proposition that a public employee who is a member of a retirement system funded through monies established under a collective bargaining agreement also remains eligible as a member of a public employment retirement system. By enacting that particular provision into law, it is clear the state legislature reaffirmed its policy that the parties could collectively bargain for such things as retirement pay.

The School District cites *Bitney v. School District No. 44*, 167 Mont. 129, 135, 535 P.2d 1273, which dealt in part with the amount of unused sick leave pay a superintendent of schools was to receive when his contract was terminated. Here, *Bitney* does little to support the School District's position; rather it supports the district court's decision. In *Bitney* there was no collective bargaining

contract covering the issue, and the School District policy was silent on the matter. This Court held that the terms of the contract entered into by and between the superintendent and the school district should be enforced and said:

"Therefore, we find plaintiff *contracted* for the regular sick leave granted to all teachers of the school district." (Emphasis added.) 167 Mont. 135, 535 P.2d 1276.

Similarly, in the instant case, it is contended the contract rights, as the district court held, should be enforced. We agree.

The employment facts are not in dispute. Driscoll had been Director of the Vo-Tech Center for several years. On January 25, 1975, he notified the School District that he intended to retire on June 30, 1975. He requested a temporary director be appointed effective February 28, 1975 and that he would remain as a consultant through June 30, 1975. On February 18, 1975, Dave Keltz was appointed assistant director in charge of operations effective February 28, 1975. Driscoll was paid as a consultant through April 1975. He was informed on April 29, 1975 that the Board of Trustees had rescinded its motion of January 20, 1975 and he was dismissed from all duties effective May 5, 1975. Driscoll performed services in May and June, but was not paid for them.

Issue I. The district court did not err in finding that Driscoll was entitled to receive 71 days sick leave multiplied by his daily rate of pay which is determined by dividing his annual salary by 190 as set forth in Article XXIV of the collective bargaining agreement entered into by and between Butte Teamsters Union, Local No. 2 and School District No. 1.

The relevant part of the collective bargaining agreement, Article XXIV, Sick Leave, reads:

"Every administrator of School District No. 1 shall be allowed an annual fifteen (15) days sick leave with full salary cumulative for one hundred fifty (150) days. Retirement pay will be 50% of accumulated sick leave and shall be included as part of the administrator's yearly salary for the year in which he retires. * * * Said

daily rate of pay shall be determined by dividing his annual salary or wage by 190."

It was stipulated between the parties that Driscoll had accumulated 142 days of annual sick leave. The School District contends that in determining how much accumulated sick leave should be paid to Driscoll as retirement pay, his yearly salary of $24,000 should be divided by 260, and then, that figure should be multiplied by 71 days (50% of the accumulated sick leave—Article XXIV, Sick Leave). Driscoll contends, and it was found by the district court, that he should be paid sick leave pay in terms of retirement at the rate of $127.46 by dividing his annual salary of $24,000 by 190 × 71 days, as is clearly set forth in Article XXIV of the contract.

We note the quoted portion of Article XXIV of the contract relates to benefits and coverage for *every administrator*. The School District concedes that the contract generally, and that clause particularly, covers Driscoll. There is nothing whatsoever in this particular clause indicating the parties should use the figure "260" in the formula for determining how much accumulated sick leave will be received as retirement pay by the administrator. The chairman of the Board of Trustees admitted that the figure "260" was picked out of the air; while the school clerk asserted that the figure "260" should be used because it has reference to the number of days Driscoll was employed under his contract. That is not part of the contract agreed upon by the parties; rather, the parties agreed to use the figure "190".

It is clear the language of the particular contract clause was what was contracted for. Jim Roberts, secretary-treasurer of the Teamsters Union, who negotiated the contract testified:

"Q. Will you relate to the Court, if you can remember that, particularly in the 1974 negotiations the meetings concerning this particular provision? A. During the course of all collective bargaining processes with the administrators we have submitted demands to the Board to improve sick leave as it is spelled out in the current contract and during all of the collective bargaining nego-

tiations you reach a point where some of the things have to go by the wayside and during the '74 and '75 negotiations we reached that point and we went into caucus without committees and it was decided that based on the, as our understanding of the negotiated provisions as it exists, that we were adequately protected and to back off on our proposals and in doing so we tried to make it known to the school board that we felt, with the fact that the 190 days was a formula used that we were adequately protected on our sick leave.

"Q. It was your interpretation that the 190 figure divided into their annual salary applied to every administrator in the district? A. Without question.

"Q. And the Board, to your understanding, fully understood that? A. Yes, definitely.

"Q. In regard to that, what have they done as far as the negotiations that are presently involved in this regard to that article? A. At the last bargaining session we had with the Board of Trustees on February 24, I believe that's when it was, the Board submitted a proposal to us even though it may have been untimely to modify the current sick leave provisions to spell out that the 190 days be changed to read the actual number of days that each administrator has worked, his work year schedule."

"(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest * * *."

Since Wight did not claim an interest in the case below the court was not required to join him as a party, but because his interests would clearly have been affected by the court's judgment, the court should have joined him as a party. Under Rule 21, M.R.Civ.P., the district court may drop or add parties on motion of any party "or of its own initiative" at any time during the proceedings.

■■ In this situation Wight was not bound by the court's conclusions of law and judgment since he was not a party. However, he would be limited in exercising his right of contribution

from S-W Company on the debt if S-W's liability was decided in Wight's absence. The basis of the rule on joinder is founded on due process considerations of notice and a right to be heard. On remand Wight should be joined as a party so that he is not deprived of due process.

We reverse the summary judgment of the district court, set aside the findings of fact and conclusions of law, and order further proceedings not inconsistent with this opinion.

MR. CHIEF JUSTICE HATFIELD, and JUSTICE HASWELL, HARRISON and DALY concur.