No. 14822

IN THE SUPREME COURT OF THE STATE OF MONTANA

FARMERS STATE BANK OF VICTOR, MONTANA
a Montana Corporation,

                    Plaintiff and Respondent,

    and

HARRY JOHNSON and HELEN A. JOHNSON,
husband and wife,

                    Cross-complainants,

    vs.

JAMES G. EDMISTON and PHILLIS EDMISTON,
husband and wife,

                    Cross-defendants and Appellants.

Appeal from:  District Court of the Fourth Judicial District,
                In and for the County of Ravalli.
                Honorable E. Gardner Brownlee, Judge presiding.

Counsel of Record:

    For Appellants:

        Datsopoulos and MacDonald, Missoula, Montana

    For Respondent:

        Boone, Karlberg & Haddon, Missoula, Montana

Submitted on briefs: February 27, 1980

Decided: MAY 8 - 1980

Filed: MAY 8 - 1980

_Thomas J. Kearney_
                  Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Farmers State Bank brought this action to collect on a promissory note executed by Imperial Cattle Company (Company). In addition, the Bank asserted a claim against James and Phillis Edmiston for conversion of property in which the Bank held a security interest as security for the note. Following depositions the Bank moved for summary judgment. The Edmistons did not file affidavits or briefs in response to the motions. Summary judgment in favor of the Bank and against all of the defendants was entered. Only the Edmistons appeal.

The Company was incorporated in 1967 by appellant and two other individuals not involved in this suit. The Company remained dormant until defendants Lillethun and Rock became involved and began engaging in the dairy business in March of 1973. James Edmiston was president and Rock and Lillethun became vice-presidents of the corporation.

In March, 1973, Edmiston was in financial difficulties and needed to obtain refinancing of certain items of machinery. He contacted Western Farm Bureau, and a loan was made for the re-financing. This loan was taken under the name of the Company and Western was told that the equipment belonged to the Company. The Company insured the equipment with the Wyoming Farm Bureau. The loan was also personally guaranteed by Edmiston.

In May, 1973, the Bank began to loan money to Lillethun. These loans were secured by milk assignments and were guaranteed by Rock. According to the depositions the money from the loans was put into the Company checking account and used to meet Company expenses such as the payroll and cattle feed. By March 1, 1974, these loans amounted to $35,600. On that date the Company executed a note with the Bank for $35,810.79. Rock and Lillethun signed this new note in their corporate capacity as vice-presidents of

the Company. The money from the new loan was used to pay in full the Lillethun loans. This note was also personally guaranteed by Rock and Lillethun. To secure the note the Company also executed and delivered to the Bank a security interest in certain equipment which was in the name of the Company. This was the same equipment which was covered by the loan made by Western Farm Bureau and insured by the Wyoming Farm Bureau.

At the same time that the Bank entered into the loan with the Company, the Bank also required Rock and Lillethun to personally sign a note for the same amount ($35,810.79). The banker who made the two loans said that the second loan was "to emphasize that I'm looking to them [Rock and Lillethun] also personally if Imperial Cattle Company did not pay."

Apparently, Edmiston was not active in the management of the dairy. This was left to Lillethun and Rock. As to Edmiston's knowledge of the loans being made to Lillethun, Edmiston testified in his deposition as follows:

> "Q. And you knew that they had, they were dealing with the bank as far as getting funds to operate Imperial Cattle? A. Yes.
>
> "Q. Okay. A. Well, I don't want to give you the impression that I knew anything about the dealings of the bank because I did not.
>
> "Q. Without asking you as to knowledge of specific transactions, I am speaking in general terms. A. They told me they'd be able to do business with the Victor Bank.
>
> "Q. And you knew that they had been doing business with the bank as far as borrowing money for Imperial Cattle? A. Yes.
>
> "Q. The bank at Victor? A. Yes."

Lillethun testified in his deposition that he was sure that Edmiston knew of the loans and that Edmiston knew the money was being used to operate the Company " . . . because this had been the pattern of our operation from the . . . beginning." Rock testified to the same effect.

Rock and Lillethun executed the $35,810 corporate note and the security agreement pursuant to a corporate resolution of the Company. This resolution, adopted on March 6, 1973, provided in part:

> "Be it further resolved that the President, Vice-president, and the Secretary-Treasurer or any two of them shall be authorized and empowered to act in the name of the corporation and execute and deliver any note, mortgages, leases, security agreements, or other instruments evidencing indebtedness for money so borrowed."

The security agreement which secured the note had a provision which stated that the sale of the collateral constituted a default. Before any action to collect on the note was commenced Edmiston sold some of the secured equipment. The proceeds of the sale were not transferred to the Company or to the Bank.

The sole issue which this case presents is whether the District Court erred in entering summary judgment against the Edmistons.

This Court in Anderson v. Applebury (1977), 173 Mont. 411, 567 P.2d 951, made the following observations:

> "The principles governing summary judgment under Rule 56(c), M.R.Civ.P., were recently detailed in Harland v. Anderson, 169 Mont. 447, 548 P.2d 613. Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. The initial burden of establishing the absence of any genuine issue of material fact is upon the movant. The party opposing the motion will be afforded the benefit of all reasonable inferences which may be drawn from his offered proof. Mally v. Asanovich, 149 Mont. 99, 423 P.2d 294; Johnson v. St. Patrick's Hospital, 148 Mont. 125, 417 P.2d 469. However, where the record before the court discloses no genuine issue of material fact, the burden shifts to the party opposing the Rule 56(c) motion to come forward with proof establishing such a genuine factual issue. Harland v. Anderson, supra; Rickard v. Paradis, 167 Mont. 450, 539 P.2d 718; Barich v. Ottenstror, 170 Mont. 38, 550 P.2d 395." 173 Mont. at 414-15.

This Court is still guided by the principles enunciated in Anderson.

The Edmistons contend that a material question of fact

exists as to the authority of Lillethun and Rock to sign the note in their corporate capacity. This contention is based on the argument that the corporate resolution, cited above, does not allow two vice-presidents to sign such a note. The Edmistons argue that the resolution requires either the president or the secretary-treasurer, if not both, to be parties to any borrowing that the Company might engage in.

This contention is actually a legal argument. The material facts are not disputed. The resolution was in effect at the time the loan was made and Rock and Lillethun, as vice-presidents, signed the note. Whether they were parties capable of contracting, under these facts, is a legal question.

Section 1-4-101, MCA, states, in part:

"In the construction of an instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted . . ."

The resolution states " . . . that the President, Vice-president, and the Secretary-Treasurer or any two of them . . ." are empowered to act in the name of the Company. This language indicates that corporate officers from at least two of the three above-designated titles must sign the note or the security agreement. In other words, either the President or the Secretary-Treasurer or both of them would have to join the vice-presidents in any action taken pursuant to this resolution.

The question of whether the Company is bound by the note and security agreement, however, does not end with a finding that the resolution did not permit Lillethun and Rock to act on these matters. In Edwards v. Plains Light & Water Co. (1914), 49 Mont. 535, 143 P. 962, this Court had occasion to consider whether a corporation could be bound by the corporation president's contracts when the contract was outside of the president's authority.

This Court said:

> ". . . It is well settled, however, that when the corporation entrusts to its president the active management of its business, he may bind the corporation by contracts which are within the scope of the powers of the corporation, and which are necessary or proper or usually made in the conduct of its business. (Citations omitted.) The fact that he is permitted by the board of directors to occupy the position of such an agent, carries with it the implication that he has been clothed by it with all the powers necessary to enable him to carry forward the ordinary business of the corporation; and when, as in this case, the board of directors, the members of which hold all the shares, either by direct action evidenced by a by-law or a resolution, or by continued acquiescence, authorizes or permits the president to exercise all its powers and functions, the board itself remaining entirely inactive, he becomes, for the time being, the board of directors, with all the powers it possesses, and the corporation cannot thereafter question the validity of any act done by him within the scope of its legal powers."
> 49 Mont. at 545.

This principle has been explained by the Supreme Court of Delaware in Mulco Products v. Black (1956), 50 Del. 246, 127 A.2d 851, as follows:

> ". . . even if authority were lacking yet if the corporation received and retained the fruits of the loan it is estopped to deny authority in Welch to borrow the money. This principle is settled beyond question." 127 A.2d at 856.

The facts of the instant case lend themselves to this rule of law. Edmiston had allowed Lillethun and Rock to operate the dairy business. Practically from the day the business was started the vice-presidents were required to borrow money on a short term basis. They borrowed money from the Bank for the Company at least ten times in the year preceding the March 1, 1974 note and these loans were secured by corporate milk assignments. This money was put directly into the Company's checking account and used to pay Company obligations. The $35,810 corporate note executed on March 1, 1974, was used as a mechanism to consolidate the previous loans and to provide additional security for the Bank. As noted above, Edmiston knew that the vice-presidents were borrowing money from the Bank

for the Company. He might not have known all of the details but he cannot now interpose a defense based on the corporate resolution./ As is stated in 2 Fletcher Cyc Corp. (Perm.Ed.) §773: Rue v. Northern Pacific Ry. Co. (1926), 78 Mont. 40, 252 P. 313.

> "A private corporation by accepting and retaining the fruits or benefits of an unauthorized contract or other transaction made or entered into by one of its officers thereby ratifies it and will be estopped to deny its validity and binding effect, unless the contract or transaction is in violation of some positive law or well-settled rule of public policy."

The Edmistons next contend that there exists a genuine issue of a material fact on whether the note of March 1, 1974, was for a valuable consideration. On that date a second note for the same amount was signed by Rock and Lillethun in their personal capacity. This was a device used by the bank to have additional security for the loan. The note signed by Rock and Lillethun in their personal capacity was not processed by the Bank and was never put on the Bank's books as an obligation.

The Edmistons contend that the presence of two notes creates a material fact as to which note was supported by valuable consideration. The Bank is only suing on the first note, signed by Rock and Lillethun in their corporate capacity. This note was issued by the Bank, to the Company, in order to cover the prior debts of Rock and Lillethun. Because the second note is not being sued upon, whether it is supported by valuable consideration need not be decided at this time. It is only the first note that need be considered here.

Section 28-2-801, MCA, provides:

> "Any benefit conferred or agreed to be conferred upon the promisor by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor is a good consideration for a promise."

Section 28-2-802, MCA, provides:

"An existing legal obligation resting upon the promisor, a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee is also a good consideration for a promise to an extent corresponding with the extent of the obligation, but no further or otherwise."

This Court has said that a prior debt is sufficient to constitute consideration. S-W Company v. Schwenk (1977), 173 Mont. 481, 568 P.2d 145, 148. In the present case, the note represented an accumulation of previous loans borrowed by Lillethun and Rock for Company purposes. This represents sufficient consideration and does not present a material issue of fact.

The Edmistons next contend that there is an issue of fact presented as to whether the assets listed in the security agreement were owned by the Company, and whether the Bank acted justifiably and in good faith in regard to its belief concerning the ownership of the assets listed in the security agreement. These assets, which served as collateral, had been treated by Edmiston as though they were corporate property. The Company listed these assets in a financial statement that reflected the loan from Western Farm Bureau as a liability. These assets were also insured by the Company. The Bank officer who made the loan relied upon these documents as expressions of Company ownership and the security agreement was based upon these documents.

Section 26-1-601(3), MCA, states:

" . . . whenever a party has, by his own declaration, act, or omission, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he cannot in any litigation arising out of such declaration, act, or omission be permitted to falsify it . . ."

This is a conclusive presumption by statute. As a matter of law Edmiston may not allege that the Company did not own the property. Edmiston allowed the Bank to rely on the documents; consequently no material issue of fact is presented in this regard.

Finally, the Edmistons contend that there is a genuine

question of material fact as to whether the Edmistons may be held individually liable for a corporate debt. The pleadings in this case show that the Bank was suing the Company on the note, and they were suing Rock and Lillethun as endorsers and guarantors of the note. The claim against the Edmistons was based on conversion. The claim, in other words, is not based upon Edmiston's status as a shareholder. Under circumstances other than those presented by this case, the issue could be framed as follows: Is the Bank entitled to recover against the Edmistons as a matter of law on a conversion theory? In the present case, however, we decline to reach this issue. We hold that the Edmistons are estopped from defending against the Bank's conversion action.

As noted above, section 26-1-601(3), MCA, prevents a party from denying any intentional act which has led another to believe a particular thing and to act upon that belief. The predecessor to this statute was considered in Waddell v. School Dist. No. 2 (1925), 74 Mont. 91, 96, 238 P. 884, and this Court said that the statute gives the basic principle of equitable estoppel. In Hustad v. Reed (1958), 133 Mont. 211, 223, 321 P.2d 1083, this Court said:

> "'" . . . The following six essential elements have been held necessary to constitute an equitable estoppel: '1. There must be conduct--acts, language, or silence--amounting to a representation or a concealment of material facts. 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. 3. The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time it was acted upon by him. 4. The conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. 5. The conduct must be relied upon by the other party, and thus relying, he must be led to act upon it. 6. He must in fact act upon it in such a manner as to change his position for the worse; in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it.'"' [117 Mont. 255, 161 P.2d 640.]"

Edmiston, although claiming to own the equipment personally, knew it was listed as an asset of the Company on financial statements and other documents. Edmiston knew that Lillethun and Rock were borrowing from the Bank for Company purposes. Edmiston should have known that the Company documents which listed the equipment as assets were being used to secure loans from the Bank. At the very least, he created a situation where the Bank had a right to believe that the equipment was Company property. The Bank officer who made the loan based the security agreement on the Company documents which listed the equipment as Company assets. This indicates that he believed that the Company did own the property.

Under these facts, the Edmistons are estopped from denying that they converted the property. By allowing others to rely on the documents which purported to show Company ownership of the property, the Edmistons' cannot now assert that they are the true owners. Consequently, they will not be allowed to say that they did not convert the property.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices