No. 83-48

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

JESSIE T. LEWIS, Estate of
WADE V. LEWIS, deceased, et al.,

Plaintiffs and Appellants,

-vs-

STATE OF MONTANA, DEPARTMENT
OF REVENUE, et al.,

Defendants and Respondents.

---

APPEAL FROM:   District Court of the Fifth Judicial District,
In and for the County of Jefferson,
The Honorable Frank E. Blair, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

John Leslie Hamner, Butte, Montana

For Respondents:

Poore, Roth and Robinson; J. Richard Orizotti,
Butte, Montana
R. Bruce McGinnis, Dept. of Revenue, Helena,
Montana

---

Submitted on Briefs:   September 15, 1983

Decided:   January 5, 1984

Filed:   JAN 5 - 1984

*Ethel M. Harrison*
_____
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiffs appeal from the order of the Fifth Judicial District Court, Jefferson County, granting defendants' motion for summary judgment. We affirm the order of the District Court.

The issue on appeal is whether the District Court properly granted defendants' motion for summary judgment.

Wade V. Lewis and Jessie T. Lewis granted to Azcon Corporation (Azcon), the exclusive rights to conduct mining exploration and removal and sale of all minerals from real property in the Elkhorn Mountains near Boulder. The agreement of the parties was contained in an "Operational Agreement" dated August 13, 1973. The defendants contend that the agreement was drafted by Wade V. Lewis, now deceased. Plaintiffs claim that the agreement was drafted by Azcon.

The parties' interests in the agreement were assignable. Azcon later assigned its rights and obligations under the operational agreement to Galli Exploration Company. All rights and obligations under the agreement were later assumed by Everett Berg, d/b/a Falcon Explorations. Berg owned the mining interest at commencement of this action.

Wade V. Lewis died in 1974. All property subject to the operational agreement is now solely owned by his wife, plaintiff Jessie Lewis. John T. Lewis, son of Wade and Jessie Lewis, is personal representative of the estate of Wade Lewis. The estate is a party to this action, although a final decree of distribution of the estate was entered in 1975. John Lewis also has power of attorney to conduct the affairs of his mother, Jessie Lewis.

As required by the agreement, an initial payment of $800 and annual rental payments of $3,500 for the years 1974 through 1980 were tendered to plaintiffs in the form of

2

personal or company checks. Plaintiffs cashed the checks, all of which were honored by defendants' banks.

In a letter dated October 20, 1980, John Lewis (Lewis) made various inquiries concerning the mining operation and requested as follows:

> "We will prefer to have the preponderance of our royalty, from this and subsequent runs, paid in gold bullion, with the remainder of the total payment via Certified Check."

However, the operational agreement did not require this form of payment and no agreement was made that payment would be as Lewis requested.

On January 23, 1981, Lewis served notice of default under the agreement upon defendants. The notice alleged six specific deficiencies:

> "1. Second Party [defendants] has failed to pay to First Parties [plaintiffs] the certain $3,500.00 annual rental due and payable on January 2, 1981; according to paragraph 5. of such agreement.
>
> "2. That Second Party has realized "Net Smelter Returns" from the operation of such Claims; and Second Party has failed to pay to First Parties the certain "Royalty" for such Net Smelter Returns called-for in said agreement, during the Royalty Periods specified therein. That Second Party has further failed to send First Parties the statement called-for in paragraph 6(d) of such agreement.
>
> "3. That Lessee has failed to account to Lessor for all minerals mined, processed and sold from such claims as required by such agreement.
>
> "4. That Lessee has failed to keep open to inspection of Lessor complete records of the entire central milling transaction as required by such agreement.
>
> "5. That Lessor is informed and believes that the Lessee, Second Party, has allowed a pretended lien to attach to said claims in the proceedings of cause 79-5193 in the Second Judicial District Court of Washoe County, Nevada; contrary to the provisions of Paragraph 9. of said agreement.
>
> "6. That Lessee has failed to provide Lessor with all maps, assay reports, drilling results, records and other data at the end of each year as provided in Paragraph 11 of such agreement."

The notice stated that pursuant to the operational agreement, defendants had 60 days to remedy the default. Defendant Berg's counsel promptly responded to the notice by letter on February 4, 1981. The letter responded point by point to Lewis' allegations of default.

A check for the $3,500 annual rental was enclosed with the letter. The letter stated that no "Net Smelter Returns" had been received and therefore no royalty payment or statement was yet due. Further, no accounting was required by the agreement because the agreement required only that records be open to inspection during business hours. The letter stated that the records were in fact open for inspection. The "lien" alleged in the notice was explained as having no effect on plaintiffs' interest because it was a judicially-ordered sale of the interest of one of the defendants. That interest was purchased by defendant Berg, who then became the owner of the entire interest under the operational agreement.

Finally, the letter requested clarification as to which records Lewis demanded. Some documents were sent to Lewis and the letter stated that any additional documents would be sent as soon as Lewis clarified his request. Lewis never responded to the letter nor otherwise requested further documents or the opportunity to inspect documents.

On April 13, 1981, Lewis sent defendants notice of termination of the operational agreement. The notice alleged that the defendants had failed to comply with the provisions of the operational agreement and had failed to cure the defaults specified in the default notice. Lewis demanded return of possession of the premises.

Defendant Berg first received net smelter returns from the refinery on April 20, 1981, seven days after the

4

termination notice. The net smelter returns totaled $393,752.19. The earned royalty was then calculated as specified in the agreement. Berg notified plaintiffs by letter dated June 8, 1981 that an earned royalty was due and payable on or before August 1, 1981. By letter dated July 24, 1981, Berg documented the calculation of the earned royalty, pursuant to paragraph 6(d) of the agreement, and enclosed a check for the calculated amount of $20,024.87. Lewis kept this check but never attempted to cash it.

Plaintiffs filed suit on April 27, 1981, seeking declarations that defendants had no interest whatsoever in the subject property, that plaintiffs were sole owners of the property and that the agreement had been void all along or had been properly terminated by the plaintiffs. Plaintiffs asked for damages for loss of minerals and for exemplary damages.

After extensive discovery, including requests for admissions and production of documents, filing of several sets of interrogatories and responses, filing of affidavits, and deposition of Lewis, defendants moved for summary judgment. The issues were briefed and argument was heard by the District Court on October 26, 1982.

The District Court found that the operational agreement was in full effect, that the terms of the agreement were not ambiguous, and that defendants had performed their obligations under the agreement or had cured any default within 60 days as required by the agreement. The Court found there were no remaining genuine issues of material fact and that defendants were entitled to judgment as a matter of law. The Court granted defendants' motion and entered judgment for defendants. Plaintiffs appeal.

Plaintiffs argue that the District Court erred in granting summary judgment. They contend that numerous genuine issues of material fact remain unresolved and that the case should be remanded for trial on the merits. We disagree.

Rule 56(c), M.R.Civ.P. provides that summary judgment is proper where:

"... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The well-settled rules applicable to summary judgment motions are set forth in Krone v. McCann (Mont. 1982), 638 P.2d 397, 399-400, 39 St.Rep. 10, 13, and we need not repeat them here.

This action revolves around whether defendants Everett Berg and Falcon Explorations, as Azcon's successors to the mineral interest, were in default of their obligations under the operational agreement. If they were, the question arises whether the default was cured or whether plaintiffs properly terminated the agreement. We will review each alleged default in light of the parties' allegations and the record.

The first default alleged by plaintiffs was defendants' failure to remit the required $3,500 rental payment on the due date of January 2, 1981. It is undisputed that the payment was due on that date but that it was not made when due. However, that payment was made on February 4, 1981. The payment was therefore made within 60 days of the January 23 default notice. Under paragraph 14 of the agreement, payment within 60 days of the notice cured the default.

Plaintiffs argue, however, that the February 4 payment did not cure the default because the payment did not include

6

$17.50 interest as required under section 31-1-106, MCA. However, even assuming that payment of interest was due under the statute, the agreement did not require payment of interest. Failure to remit the interest was not a default under the agreement. Moreover, plaintiffs did not specify in their default notice that interest was due and unpaid. The default clause requires that the notice specify the details of default so that the other party is fully informed. Plaintiffs failed to notify defendants that interest was due. Failure to include a $17.50 interest payment is immaterial.

Plaintiffs' default notice next alleged that defendants had failed to make royalty payments as due and had failed to provide the required statement detailing the royalty calculation. Plaintiffs argue that the agreement is ambiguous as to when royalty payments were due and that this ambiguity must be resolved against defendants because Azcon drafted the agreement. At least, they argue, there is a remaining factual issue as to who drafted the agreement. Plaintiffs argue the authorship issue is crucial and precludes summary judgment. Further, plaintiffs argue that this ambiguity gives rise to a question of intent which makes summary judgment inappropriate in this case.

Plaintiffs' contentions depend upon the existence of an ambiguity in the contract. The language of the contract itself is to govern its interpretation if the language is clear and explicit and does not involve an absurdity. Sections 28-3-401 and 28-3-303, MCA. It is necessary to determine who drafted the contract only where the contract contains an ambiguity that cannot be resolved by other rules of interpretation. Section 28-3-206, MCA. "Ambiguity exists when a contract taken as a whole in its wording or phraseology is reasonably subject to two different interpretations."

7

S-W Co. v. Schwenk (1977), ~~173~~ 176 Mont. 481, 485, 568 P.2d 145, 546, 550
147.

The operational agreement provides:

"6. (a) Second Party agrees to pay First Parties as earned royalty on all minerals mined, milled and shipped (or mined and shipped without milling) from the Property a percentage (determined as hereinafter set forth) of the Net Smelter Returns.

"(b) 'Net Smelter Returns' shall mean the net proceeds received by second party for said minerals sold by Second Party to a mill, smelter, mint, refinery or other bona fide purchaser (hereinafter sometimes called 'the purchasing plant') after deduction of all of the following expenses:

"(i) Charges made by the purchasing plant for treatment of the minerals, however termed, and all other deductions by the purchasing plant including penalties for impurities and metal losses.

"(ii) Costs of transportation of said minerals from the mine to the purchasing plant."

The percentage to be applied to net smelter returns to determine the amount of the earned royalty is based upon the crude ore value per ton. A table in the agreement specifically shows the percentage for each possible value per ton. The crude ore value is determined by dividing net smelter returns by the total number of dry tons mined to produce the minerals shipped to the refinery.

The agreement further provides:

"(d) Each calendar quarter shall constitute a Royalty Period commencing with the calendar quarter during which production from the Property first commences. Payments of royalty shall be made by Second Party to First Parties on or before the first day of the second month following the close of each Royalty Period. Such payments shall be accompanied by a statement signed by an authorized representative of Second Party showing the Net Smelter Returns and the Crude Ore Value Per Ton of the minerals mined from the Property settled for by the purchaser during the preceding Royalty Period."

Plaintiffs argue that under these provisions of the agreement, a royalty payment was due February 1, 1981, because minerals were extracted and shipped to the refinery during the last calendar quarter of 1980. Further, they

8

argue that even if this interpretation is not clearly correct, there is an ambiguity as to payment date which raises a material issue of fact. We disagree.

Plaintiffs' argument is based upon defining "production" as mere extraction and shipment of minerals. "Production" is not so defined in the agreement and that definition is absurd when considered in light of all royalty provisions contained in the agreement. Under plaintiffs' reading of the contract, payments would be due before the amount due could be calculated. Moreover, plaintiffs complained of nonpayment on January 23, 1981, before the payment would have been due according to their interpretation.

Defendants did not receive the first net smelter returns from the refinery until April 20, 1981, seven days after plaintiffs' termination notice. Under the terms of the agreement, it is impossible to calculate the earned royalty until net smelter returns are received. Upon receipt of the net smelter returns, defendants calculated the payment amount, began preparation of the statement required by the agreement, and notified plaintiffs that a payment was due on August 1, 1981. The payment and statement were tendered on July 24, 1981. Plaintiffs do not dispute that the amount was correctly calculated.

The due date was calculated by treating the second calendar quarter of 1981, the period in which the first net smelter returns were received, as the royalty period. This calculation was entirely consistent with the language of the agreement.

The defendants clearly performed according to the only reasonable meaning of the agreement. Reading the agreement as a whole, it is clear and unambiguous. There is no factual issue as to the intent of the contracting parties or the

meaning of the agreement. Determining the parties' obligations under the agreement was a legal question which the District Court properly determined by looking at the language of the agreement itself. See Farmers State Bank of Victor v. Johnson (Mont. 1980), 610 P.2d 1172, 1174, 37 St.Rep. 880, 883.

Plaintiffs make several other allegations regarding the royalty payment. They contend defendants had minerals in their possession and intentionally delayed receipt of net smelter returns. However, plaintiffs presented absolutely nothing to support this allegation. Unsupported conclusory or speculative statements do not raise a genuine issue of material fact. Gates v. Life of Montana Insurance Co. (Mont. 1982), 638 P.2d 1063, 1066, 39 St.Rep. 16, 19.

Plaintiffs also argue that defendant's personal check was insufficient to constitute tender because plaintiffs had notified defendants that they preferred to receive payment in gold bullion or certified check. But the agreement does not require payment by gold bullion or certified check. Defendants never agreed to such payment. The evidence is undisputed that all previous payments had been made by personal or company check, that all checks had been honored and that plaintiffs had no reason to anticipate dishonor of this check. Defendants did not default by making payment by personal check.

The third specification of default was that defendants had failed to account to plaintiffs for all minerals mined, processed and sold. But the agreement requires only that defendants maintain accounts and keep them open to inspection during business hours. It does not require that defendants furnish an accounting to plaintiffs. There is no evidence in

the record to suggest that defendants failed to keep such records or allow inspection.

The fourth alleged default was failure to keep open for inspection complete records of the "central milling transaction." However, defendants made clear in their response to the default notice that all records were open to inspection and always had been. Plaintiffs never asked to inspect the documents and never requested that records located in out-of-state offices be brought to Boulder for inspection. Defendants were willing to cooperate in allowing inspection and did not default in this respect.

The fifth specification of default was that defendants had allowed a lien to attach to the mining claims. This allegation referred to a notice of judicial sale of the interest of defendant Martineau. Berg and Martineau had been partners in a joint venture which succeeded to Azcon's interest. Berg sued Martineau, resulting in a court-ordered sale of Martineau's interest which Berg purchased. The judicial sale did not affect plaintiffs' interest, but related only to Martineau's interest in the mining rights. The agreement requires only that "no liens from any act of Second party" be allowed to "remain" on the property. Even if this judicial sale constituted a lien within the meaning of the agreement, a question we need not decide, it was removed before the 60-day remedy period had expired.

Finally, plaintiffs alleged in the default notice that defendants had failed to provide "all maps, assay reports, drilling results, records and other data at the end of each year." Again, the default notice did not give details sufficient to inform defendants how they could correct the deficiency. Defendants informed plaintiffs that they were unsure what documents or information was lacking and asked for

11

clarification of plaintiffs' demands. Defendants offered to send any documents they had. Plaintiffs received, but never responded to this request for clarification. Plaintiffs cannot claim default where they failed to specify the deficiency as required by the agreement.

Plaintiffs argue that a genuine issue of material fact remains as to whether defendant Berg is actually the successor to Azcon's interest in the operational agreement. Berg set forth in affidavits the facts relating to his acquisition of that interest. His explanation is supported by the record. Plaintiffs offered absolutely no facts to refute Berg's statements. They offered only denials that Berg's statements were true. Plaintiffs' unsupported allegations are insufficient to raise a genuine issue of material fact. The trial court has no duty to anticipate possible proof. Gates, 638 P.2d at 1066, 39 St.Rep. at 19.

Plaintiffs argue that their mere denial by affidavit of the statements in their opponents' affidavits is sufficient to raise a factual issue. We disagree. Rule 56(e), M.R.Civ.P. provides that affidavits shall be made on personal knowledge and shall set forth such facts as would be admissible in evidence. The party opposing the motion for summary judgment must present facts which are material and substantial. Cheyenne Western Bank v. Young (1978), 179 Mont. 492, 497, 587 P.2d 401, 404.

Plaintiffs have offered no facts to support their allegations regarding Berg's interest. There is no genuine issue of material fact on this point nor on any among the host of other alleged "issues" plaintiffs raise in an attempt to preclude summary judgment. These "issues" are either immaterial or mere unsupported allegations, none of which deserves discussion.

12

Plaintiffs further contend that the operational agreement violates the rule against perpetuities, section 70-1-408, MCA. We reject this argument.

Section 4 of the agreement provides for an initial five-year term. The agreement could then be extended for a second five-year term if the second party is actively engaged in prospecting, developing or mining the property. After the second five-year term, if the second party is engaged in commercial production of minerals, the agreement would continue for four additional consecutive five-year terms and then for an additional period of time so long as an active mining operation is being carried on by the second party.

In Montana Consolidated Mines Corp. v. O'Connell (1938), 107 Mont. 273, 85 P.2d 345, mining property was leased:

> ". . . for the period of two years from and after the execution of this contract with the privilege in the party of the second part to extend this contract from year to year provided the party of the second part works said mine continuously from and after the date of this agreement and subject to the terms thereof." 107 Mont. at 274, 85 P.2d at 345.

The Court quoted from Haeffner v. Green Fire Brick Co. (Mo. 1934), 76 S.W.2d 122, which stated that a right to renew or extend a lease limited by the clause "so long as paying minerals are found," although indefinite, was not a perpetuity. Further, the Missouri court stated that "[u]nder the law of this state, and generally, a lease is not made void by reason of a covenant of perpetual renewal." 107 Mont. at 282, 85 P.2d at 349, quoting Haeffner, 76 S.W.2d at 126. This Court found that the provision did not violate the rule against perpetuities. Here, the extension of the agreement is limited first by "commercial production of minerals" and then by the continuation of "an active mining

13

operation." There is no merit to plaintiffs' claim that the operational agreement violates the rule against perpetuities.

We need not address the parties' lengthy argument regarding the applicability of the forfeiture statute because the agreement is clearly in effect.

Finally, plaintiffs complain that the District Court did not enter findings of fact and conclusions of law. However, there is no requirement that the District Court do so under these circumstances. Rule 52(a), M.R.Civ.P. provides that findings and conclusions are not required on summary judgment motions. Downs v. Smyk (1979), 185 Mont. 16, 19, 604 P.2d 307, 309.

There being no genuine issues of material fact, and defendants being entitled to judgment as a matter of law, the District Court's order granting summary judgment is affirmed.

Justice

We concur:

Justices

14