# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ESG CAPITAL PARTNERS II, LP, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 11053-VCL |
| | ) | |
| PASSPORT SPECIAL OPPORTUNITIES MASTER FUND, LP, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 16, 2015
Date Decided: December 16, 2015

Philip Trainer, Marie M. Degnan, ASHBY & GEDDES, P.A., Wilmington, Delaware; Madlyn Gleich Primoff, Benjamin Mintz, Kyle D. Gooch, KAYE SCHOLER LLP, New York, New York; *Counsel for Plaintiffs.*

A. Thompson Bayliss, David A Seal, ABRAMS & BAYLISS LLP*,* Wilmington, Delaware; Thomas K. Cauley, Jr., Steven E. Sexton, SIDLEY AUSTIN LLP, Chicago, Illinois; *Counsel for Defendants Passport Special Opportunities Master Fund, LP and Passport Capital, LLC.*

Richard W. Riley, DUANE MORRIS LLP, Wilmington, Delaware; Jeffrey W. Spear, William C. Heuer, DUANE MORRIS, LLP, New York, New York; *Counsel for Defendant Pearl Capital Partners, LP.*

David A. Felice, BAILEY & GLASSER, LLP, Wilmington, Delaware; James M. Wines, LAW OFFICE OF JAMES M. WINES; Alexandria, Virginia; *Counsel for Defendants Phelim Dolan and Lauren Zalaznick.*

Joanna J. Cline, James H. S. Levine, PEPPER HAMILTON LLP, Wilmington, Delaware; *Counsel for Defendants Michael Bateman, Brazos Global Investors LP, Fannie Calabro Felice, Renee Luciano, Robert Luciano, Jeffrey E. Sefchok Sr., Gary Sefchok, Timothy Sefchok, James J. White, and Tracy White.*

**LASTER, Vice Chancellor.**

Non-party Timothy Burns formed ESG Capital Partners II, LP (the "Partnership") for a limited purpose. After raising money from investors, the Partnership would purchase shares of stock of Facebook, Inc. before that company's then-anticipated initial public offering. Preferably once Facebook had completed a successful IPO, the Partnership would distribute to its investors either the Facebook shares themselves or their cash value. After that, the Partnership would dissolve.

The constitutive agreement governing the Partnership (the "Partnership Agreement" or "PA") divided the aggregate equity stake in the Partnership into "Units." Investors in the Partnership became limited partners by purchasing Units. The Partnership Agreement made clear that any distributions would be made to all partners in proportion to their respective "Percentage Interests," defined as the number of Units that each partner held divided by the total number of Units outstanding.

Forty-four investors purchased Units, and the Partnership used their capital to buy Facebook shares. But rather than making a distribution in compliance with the Partnership Agreement, Burns made preferential transfers to certain limited partners. The favored limited partners received one Facebook share for each of their Units, without regard to their actual Percentage Interests. Other limited partners either did not receive any Facebook shares or received less than one Facebook share for each of their Units, again without regard to their actual Percentage Interests.

1

In this action, the investors who got too little (the "Disfavored LPs") sued the investors who got too much (the "Favored LPs").[1] The plaintiffs contend that by receiving excess Facebook shares, the Favored LPs breached the Partnership Agreement, wrongfully converted property, and were unjustly enriched. The Favored LPs have moved to dismiss the complaint for failing to state a cognizable claim for relief.

The defendants' motion is granted as to the claims against Passport Capital LLC, which was not a limited partner and did not receive a preferential transfer. The defendants' motion also is granted as to Count IV, which seeks redundant declaratory relief regarding the meaning of the Partnership Agreement.

Otherwise, the defendants' motion is denied. The Favored LPs argue primarily that they were entitled to one Facebook share for each Unit they owned, regardless of the Percentage Interest that their Units represented. The Favored LPs then posit that they received no more than what they were entitled to, so no one could have been harmed or have a claim. These positions conflict with the Delaware Uniform Limited Partnership Act (the "LP Act"), which distinguishes between the assets of a limited partnership and an ownership interest in the limited partnership. The Favored LPs' positions also conflict with multiple provisions in the Partnership Agreement and with language found

---

[1] The Disfavored LPs are plaintiffs Hawk Management, LP, Joelco. Investment Company LLC, Speisman Family 2000 LP, David Brumbaugh, Scott Brumbaugh, Robert Lee Hitchock, Johns Martin, Bernard Poussot, William Simon, and Jesse Haywood Washburn. The Favored LPs are defendants Passport Special Opportunities Master Fund, LP, Pearl Capital Partners, LP, Brazos Global Investors LP, Michael Bateman, Phelim Dolan, Fannie Calabro Felice, Renee Luciano, Robert Luciano, Jeffrey F. Sefchok Sr., Gary Sefchok, Timothy Sefchok, James J. White, Tracey White, and Lauren Zalaznick.

2

throughout the offering-related documents pursuant to which the Favored LPs purchased Units. The Favored LPs' other grounds for dismissal fare no better. Counts I, II, III, and V will proceed beyond the pleadings stage against the Favored LPs.

## I.     FACTUAL BACKGROUND

The facts for purposes of the motion to dismiss are drawn from the verified complaint (the "Complaint") and the documents it incorporated by reference. At this stage of the case, the Complaint's well-pled allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.

## A.     Burns Forms The Partnership And Raises Money From Investors.

In 2011, Burns formed the Partnership. He also formed non-party ESG Capital Partners GP, Inc. (the "Original GP"), which served as the general partner of the Partnership until December 2012. Burns controlled the Original GP and, through it, the Partnership.

Between October 3, 2011 and April 26, 2012, Burns raised money from investors by distributing a Confidential Private Placement Memorandum (the "PPM") and a Limited Partnership Interest Subscription Agreement (the "Subscription Agreement" or "SA"). The PPM described the Partnership and the Units and contained the information on which investors could rely when deciding whether to invest. The Subscription Agreement defined the terms on which the investors agreed to purchase Units.

A total of forty-four investors purchased Units and became limited partners. The Disfavored LPs executed the Subscription Agreement, made their capital contributions, and became limited partners in the Partnership. So did the Favored LPs.

Passport Capital is the investment manager for defendant Passport Special Opportunities Master Fund, L.P. (the "Passport Fund"). Passport Capital attempted to secure preferential treatment for the Passport Fund through a side letter with the Partnership dated March 4, 2012 (the "Side Letter"). Passport Capital signed the Side Letter on behalf of the Passport Fund. Burns signed the Side Letter on behalf of the Original GP, which signed on behalf of the Partnership. The other limited partners were not parties to the Side Letter and did not consent to its terms.

On March 5, 2012, Passport Capital executed a Subscription Agreement on behalf of the Passport Fund. Pursuant to the Subscription Agreement, the Passport Fund acquired 100,000 Units for a total purchase price of $3.3 million.

## B. Burns' Defalcations And The Preferential Transfers

In March 2012, the Partnership paid approximately $14 million to purchase 452,515 Facebook shares. In May 2012, Facebook completed its IPO.

After the IPO, Burns wrongfully diverted cash, shares, and other Partnership property. Burns was indicted criminally and convicted for his misconduct.

In November 2012, before his wrongdoing was discovered, Burns caused the Partnership to transfer 376,465 shares to the limited partners. Burns did not distribute the shares in accordance with the Partnership Agreement. Instead, Burns made preferential transfers to the Favored LPs.

In total, the Favored LPs received 136,350 shares of Facebook common stock, a figure equating to one Facebook share for each Unit that they held. The transfer treated

the Favored LPs as if all 452,515 shares of Facebook stock were available for distribution. But because of Burns' defalcations, the Partnership had fewer shares.

The Disfavored LPs were not treated similarly. Some received less than one share of Facebook common stock for each of their Units. Others did not receive anything. Rather than all of the partners suffering proportionately, the Disfavored LPs alone bore the costs of Burns' wrongdoing.

**C.     The Successor GP Replaces The Original GP And Seeks To Unwind The Preferential Transfers.**

In December 2012, certain limited partners uncovered what Burns had done. They demanded that Burns and the Original GP either withdraw or resign. In response, Burns signed a document dated December 19, 2012, stating that the Original GP would immediately cease performing its duties as the general partner of the Partnership. Burns also issued a Notice of Meeting for a special meeting of limited partners of the Partnership to be held on December 20, 2012. At the special meeting, holders of a majority of the limited partner interests in the Partnership elected plaintiff ESG Successor II, LLC (the "Successor GP"), an entity unaffiliated with Burns, as the general partner of the Partnership.

On March 13, 2015, the Successor GP sent letters on behalf of the Partnership to the Favored LPs demanding that they return the shares they had received or pay the Partnership the current market value of the shares. The letters stated that after recovering the preferential transfers, the Successor GP would make a distribution of shares or cash to

all limited partners based on their Percentage Interests. The Favored LPs did not return their Facebook shares or otherwise repay the Partnership.

## D. This Litigation

On May 20, 2015, the Disfavored LPs, the Successor GP, and the Partnership filed this action against the Favored LPs and Passport Capital. The Complaint contained five counts:

- Count I asserted a claim for breach of the Partnership Agreement.

- Count II asserted a claim for conversion and alleged that the Favored LPs were wrongfully exercising dominion and control over the shares of Facebook stock that they received.

- Count III asserted a claim for unjust enrichment based on the preferential transfers of Facebook shares to the Favored LPs.

- Count IV sought a declaratory judgment that the preferential transfers violated the Distribution Provisions.

- Count V sought to recover the plaintiffs' attorneys' fees and expenses under the loser-pays clause in the Partnership Agreement.

The defendants moved to dismiss the Complaint. The parties passed over Count V, which rises or falls depending on whether the plaintiffs prevail on their other claims. This decision does not address Count V either.

## II.     LEGAL ANALYSIS

The defendants have moved to dismiss the Complaint for failing to state a claim on which relief can be granted. When considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff

6

would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (footnotes and internal quotation marks omitted).

## A. Count I: Breach Of Contract

Count I of the Complaint asserts a claim for breach of contract. To state a claim for breach of contract, a plaintiff must allege the existence of a contract, breach, and causally related damages. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

The Complaint pleads that the Favored LPs are parties to the Partnership Agreement. "Limited partnership agreements are a type of contract." *Norton v. K-Sea Transp. P'rs L.P.,* 67 A.3d 354, 360 (Del. 2013). By statute, "[a] partner of a limited partnership . . . is bound by the partnership agreement whether or not the partner . . . executes the partnership agreement." 6 *Del. C.* § 17-101(12). The Favored LPs are therefore parties to the Partnership Agreement, which can be enforced against them. "[P]artnership agreements should be and are enforceable against limited partners in accordance with their terms." Martin I. Lubaroff & Paul M. Altman, *Delaware Limited Partnerships* § 5.7 (supp. 2012).

The Complaint pleads a breach of the Partnership Agreement. In multiple sections, the Partnership Agreement required that any returns to investors take the form of distributions proportionate to each investor's Percentage Interest. The Partnership Agreement first introduced these concepts in Section 1.5, entitled "Term," which linked

7

the termination of the Partnership's otherwise perpetual existence to fulfilling its purpose of acquiring Facebook shares, then distributing the shares or their cash value to the partners in proportion to their Percentage Interests. Section 1.5 stated:

> The Partnership shall have perpetual existence unless sooner dissolved or terminated as herein provided or otherwise by law.

> Notwithstanding the foregoing, in the event Facebook undergoes an [IPO] . . . , the Partnership shall either sell its shares of stock in Facebook and distribute the proceeds therefrom or distribute its assets and proceeds to the Partners in accordance with the terms and conditions set forth in greater detail herein, after which the Partnership shall be dissolved.

> . . . In the event Facebook does not undergo an IPO within a period of thirty (30) months following the closing of the purchase of the shares of Facebook stock, upon the request of a Limited Partner, the General Partner shall . . . use commercially reasonable efforts to either distribute to such Limited Partner, or liquidate and distribute the proceeds resulting therefrom, a number of shares of Facebook held by the Partnership in proportion to such Limited Partner's Percentage Interest in the Partnership.

PA § 1.5 (the "Limited Term Provision"; formatting as separate paragraphs added for clarity).

Under the Limited Term Provision, once the Partnership purchased Facebook shares, there were two ways for the limited partners to receive returns. One possibility was for Facebook to conduct an IPO, in which case the Partnership would "sell its shares of stock in Facebook and distribute the proceeds therefrom or distribute its assets and proceeds to the Partners . . . , after which the Partnership shall be dissolved." The other possibility was for Facebook not to conduct an IPO, in which case the Partnership would "use commercially reasonable efforts to either distribute to such Limited Partner, or liquidate and distribute the proceeds resulting therefrom, a number of shares of Facebook

held by the Partnership in proportion to such Limited Partner's Percentage Interest in the Partnership." In either situation, the partners would receive their proportionate share of a distribution.

Two other sections of the Partnership Agreement specified what was meant by a distribution. Section 4.1 provided for distributions generally. It stated:

> Any Cash Flow or other property of the Partnership that the General Partner determines is available for distribution shall be distributed to the General Partner and the Limited Partners from time-to-time as the General Partner determines *in proportion to each Partner's respective Percentage Interests* [sic].

*Id.* § 4.1 (emphasis added). Section 4.4 provided for distributions following a defined "Sales of Assets." It stated:

> All net cash proceeds arising as a result of a Sale of Assets not required to pay, discharge or provide for the Partnership's debts and obligations or to fund other reserves shall, within thirty (30) days after receipt thereof by the Partnership, be distributed among the Partners *in proportion to their respective Percentage Interests.*

*Id.* § 4.4 (jointly with Section 4.1, the "Distribution Provisions"; emphasis added). The plain language of both provisions contemplated distributions to the partners as a class, not as one-off transfers to certain limited partners. The provisions also contemplated that each partner would share in any distribution based on that partner's Percentage Interest, an amount determined by "dividing the number of Units held by [a] Partner by the total number of Units then outstanding." *Id.* at sched. B (defining Percentage Interest); *accord id.* § 1.7 ("Each Unit shall entitle the holder thereof to an ownership interest in the Partnership equal to a percentage equal to 1 divided by the total number of Units outstanding as of the time of determination of such percentage.").

9

The Complaint adequately pleads that the Distribution Provisions were breached and that the Disfavored LPs suffered harm. Contrary to the terms of the Partnership Agreement, the Favored LPs received preferential transfers at the expense of the Disfavored LPs. Rather than receiving Facebook shares in accordance with their Percentage Interests, the Favored LPs received one Facebook share for each Unit they held. Meanwhile, the Disfavored LPs received either zero Facebook shares or less than one Facebook share for each Unit they held.

In an effort to defeat this claim at the pleadings stage, the Favored LPs offer a number of responses. Their arguments fall into two groups: (i) arguments that apply to all of the Favored LPs, and (ii) arguments unique to the Passport Fund.

### 1. The Claim To Own Specific Facebook Shares

The Favored LPs' primary defense to the breach of contract claim is that they each had an ownership interest in the Partnership's shares of Facebook stock equal to the number of Units they held. From that premise, they argue that no breach of contract could have occurred because they each received a number of Facebook shares equal to the number of Units they held. According to the Favored LPs, they effectively received a ratable distribution, so the Complaint should be dismissed. These arguments are frivolous.

### a. No Ownership Interest In Partnership Property

The Favored LPs argue in the first instance that they had an ownership interest in the Partnership's underlying Facebook shares. That is wrong.

10

By claiming an ownership interest in particular Facebook shares, the Favored LPs are claiming an ownership interest in specific Partnership property. By statute, a limited partnership is a separate entity, and individual partners do not have any rights in specific partnership property. The LP Act says just that: "A partner has no interest in specific limited partnership property." 6 *Del. C.* § 17-701. What a partner instead owns is a "partnership interest." The LP Act defines that term as "a partner's share of the profits and losses of a limited partnership and the right to receive distributions of partnership assets." *Id.* § 17-101(13). Ownership of a partnership interest does not carry with it any rights to specific limited partnership property.

Although clear as a matter of statutory law, the Partnership Agreement reiterated these propositions. Section 1.4 of the Partnership Agreement, titled "Purposes, Business and Objections," confirmed that investors in the Partnership were not obtaining an ownership interest in Facebook shares. It stated:

> The purpose of the Partnership and the business to be carried on and the objectives to be attached by it are to invest its funds in the stock of Facebook. *Notwithstanding the foregoing, each Limited Partner hereby acknowledges and agrees that he is investing in the Partnership and will acquire an equity interest in the Partnership, and will not, in connection with this Agreement or related investment, own nor acquire any shares of stock in Facebook.*

PA § 1.4 (the "Limited Purpose Provision"; emphasis added).

Section 1.7 of the Partnership Agreement addressed the nature of an ownership interest in the Partnership. It stated:

> The Partnership shall have two (2) classes of Partnership Interests: "General Partnership Interests", [sic] and "Limited Partnership Interests." Limited Partnership Interests and General Partner Interests shall be

11

reflected by the issuance of units ("Units"). Such Units shall represent an ownership interest in the Partnership (which shall be considered personal property for all purposes), consisting of (a) an interest in Profits and Losses, specially allocated items and distributions pursuant to this Agreement, and (b) to the extent provided in this Agreement or required under the [LP Act], the right to vote or grant or withhold consents with respect to Partnership matters.

*Id.* § 1.7 (the "Partnership Interest Provision").

The very next provision, Section 1.8, distinguished between an interest in the Partnership and ownership of Partnership property. It stated:

(a) . . . All real and personal property owned by the Partnership shall be owned by the Partnership as an entity. The General Partner's and each Limited Partner's interest in the Partnership shall be personal property for all purposes.

(b) No limited Partner shall, either directly or indirectly, take any action to require partition or appraisement of the Partnership or of any of its assets or cause the sale of any Partnership assets for other than a Partnership purpose, and notwithstanding any provision of applicable law to the contrary, each Limited Partner . . . hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to its, his or her Limited Partnership Interest or with respect to any assets of the Partnership, except as expressly provided in this Agreement.

*Id.* § 1.8 (the "Entity Ownership Provision"). Along similar lines, Section 3.4 stated that "[e]xcept as otherwise expressly provided herein, the Limited Partners shall not . . . have any control over the Partnership's business or assets." *Id.* § 3.4.

Under these provisions, the Partnership owned its assets. No partner owned specific Partnership assets. Nor could a partner seek to establish ownership rights in Partnership assets, whether by an action for partition or otherwise.

In addition to the LP Act and the Partnership Agreement, the PPM described the nature of the ownership interest that investors were purchasing. In three locations, each

12

set off from the remainder of the text in a block paragraph and printed entirely in capitalized letters, the PPM stressed that investors would own Units representing a partnership interest, not any rights in individual Facebook shares.

On the first substantive page of the PPM, in the "EXECUTIVE SUMMARY," under the heading "Overview," the PPM stated:

> THIS OFFERING IS FOR LIMITED PARTNERSHIP INTERESTS IN ESG CAPITAL PARTNERS II, LP, AND IS NOT AN OFFERING FOR SHARES OF FACEBOOK STOCK. IF YOU PURCHASE LIMITED PARTNERSHIP INTERESTS IN THIS OFFERING, YOU WILL NOT OWN SHARES OF FACEBOOK STOCK AS A RESULT OF SUCH PURCHASE.

PPM at 1.

On the third page of the document, under the heading "EXECUTIVE SUMMARY OF PRINCIPAL TERMS," the PPM stated:

> THIS OFFERING IS FOR LIMITED PARTNERSHIP INTERESTS IN ESG CAPITAL PARTNERS II, LP, AND IS NOT FOR SHARES OF FACEBOOK STOCK. IF YOU PURCHASE LIMITED PARTNERSHIP INTERESTS IN THIS OFFERING, YOU WILL NOT OWN SHARES OF FACEBOOK STOCK AS A RESULT OF SUCH PURCHASE.

*Id.* at 3.

On the fourth page of the document, under the heading the "THE FUND," the PPM stated:

> THE FUND IS OFFERING FOR SALE LIMITED PARTNERSHIP INTERESTS. ANY INVESTOR IN THE FUND WILL NOT, AS A RESULT OF THIS OFFERING, OWN SHARES OF FACEBOOK STOCK.

*Id.* at 4.

The PPM described with similar precision the fact that investors would not necessarily receive one Facebook share for each Unit they purchased. The PPM advised that "[t]he Fund intends to liquidate its position [in Facebook shares] at the termination of any lock-up period following an Initial Public Offering of Facebook, or at such other time when the General Partner determines is in the best interests of the Fund." *Id.* at 9. Any cash distribution would be made after accounting for the General Partner's management fee, a one-time incentive fee equal to ten percent of the net profits generated during the life of the Partnership, as well as other Partnership expenses. *Id.* at 10. The PPM noted that the General Partner could make partial distributions, but that in the event the General Partner did so, the Partnership would "promptly distribute to the Limited Partners a *pro rata* portion of the proceeds to which each Limited Partner shall be entitled, subject to any fees, expenses, funding of reserves, etc." *Id.* at 5; *accord id.* at 4.

Finally, there was the Subscription Agreement. The formal title of that document was the "Limited Partnership Interest Subscription Agreement," which made clear that each subscriber was buying a "Limited Partnership Interest," not a particular number of Facebook shares. Anyone who skipped the title encountered the same concept in the introductory paragraphs, which recited that the subscriber was "purchasing the limited partnership interests hereunder" and that the "[s]ubscriber desires to subscribe for certain limited partnership interests in the Partnership." SA at 1. And Section 4(b) of the Subscription Agreement stated that "[e]ach Unit entitles the holder thereof to a percentage of ownership in the Partnership," not specific Facebook shares.

14

The plain language of the LP Act, the Partnership Agreement, the PPM, and the Subscription Agreement made clear what the limited partners bought when they purchased Units. The first step in the Favored LPs syllogism—that by purchasing Units they acquired the right to a particular number of Facebook shares—is frivolous.

### b. Preferential Transfers Are Not A Ratable Distribution

The Favored LPs next argue that because the number of shares they received matched the number of Units they held, they effectively received a ratable distribution that complied with the Distribution Provisions. That is not correct either.

The Distribution Provisions require that any distribution be made in accordance with the partners' Percentage Interests. Although the calculation of each partner's Percentage Interest uses the number of Units held as the numerator and the total number of Units outstanding as the denominator, it is the resulting percentage that determines what portion of the distribution each limited partner receives. The number of Units that a limited partner holds is only an input to that calculation. There is no right under the Partnership Agreement to receive a number of Facebook shares equal to the number of Units held.

An example with numbers may help. Assume that the Partnership acquired 100 Facebook shares and issued a total of 100 Units. Assume that a limited partner purchased 10 Units. The limited partner's Percentage Interest is 10%, so if the Partnership distributed all of the Facebook shares, the limited partner would receive 10 shares. Now assume that before making the distribution, the Partnership became liable to a third party and sold 10 of the Facebook shares to pay the debt, leaving only 90 Facebook shares. The

15

limited partner's Percentage Interest is still 10%, but that percentage now results in the limited partner receiving 9 shares. Under the terms of the Distribution Provisions, Units do not correspond on a one-for-one basis with shares.

In this case, Burns' defalcations reduced the number of Facebook shares below a one-for-one correspondence with the number of Units. The Distribution Provisions called for distributions based on Percentage Interests. As in the simplified example, a limited partner owning the same number of Units continued to own the same Percentage Interest, but that Percentage Interest yielded fewer shares. When the Favored LPs received one Facebook share for each Unit they held, they received more than what their Percentage Interest in a distribution would have generated. They received preferential treatment, not the practical equivalent of a ratable distribution.

The Favored LPs' syllogism thus fails again for want of its second critical premise. Just as the Favored LPs did not have an ownership interest in the Partnership's Facebook shares, so too they did not receive the equivalent of a ratable distribution from the Partnership.

### 2. Section 17-607 Of The LP Act

As a backstop to their primary argument, the Favored LPs contend that Section 17-607(b) of the LP Act provides the exclusive means for challenging any distribution. *See* 6 *Del. C.* § 17-607. There are at least two fundamental problems with this contention. The Partnership did not make a distribution, and Section 17-607(b) is not exclusive.

In its entirety, Section 17-607 states:

16

(a) A limited partnership shall not make a distribution to a partner to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited partnership, other than liabilities to partners on account of their partnership interests and liabilities for which the recourse of creditors is limited to specified property of the limited partnership, exceed the fair value of the assets of the limited partnership, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the limited partnership only to the extent that the fair value of that property exceeds that liability. For purposes of this subsection (a), the term "distribution" shall not include amounts constituting reasonable compensation for present or past services or reasonable payments made in the ordinary course of business pursuant to a bona fide retirement plan or other benefits program.

(b) A limited partner who receives a distribution in violation of subsection (a) of this section, and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to the limited partnership for the amount of the distribution. A limited partner who receives a distribution in violation of subsection (a) of this section, and who did not know at the time of the distribution that the distribution violated subsection (a) of this section, shall not be liable for the amount of the distribution. Subject to subsection (c) of this section, this subsection shall not affect any obligation or liability of a limited partner under an agreement or other applicable law for the amount of a distribution.

(c) Unless otherwise agreed, a limited partner who receives a distribution from a limited partnership shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of the distribution.

*Id.*

The three subsections of Section 17-607 work together. Section 17-607(a) places a statutory limitation on a limited partnership's ability to make a distribution. In simplified terms, a limited partnership cannot make a distribution when it is balance-sheet insolvent or if the distribution would render the limited partnership insolvent. The limitation roughly parallels the statutory restriction on the ability of a corporation to pay dividends

17

or repurchase its shares, although Section 17-607(a) makes the test turn on balance-sheet solvency rather the concept of available surplus.[2]

Next, Section 17-607(b) limits the available remedies *for a violation of Section 17-607(a)*. In three places, Section 17-607(b) references a distribution "in violation of subsection (a) of this section." Subsection (b) does not purport to apply to other restrictions on distributions. Indeed, subsection (b) makes this explicit by stating: "Subject to subsection (c) of this section, this subsection shall not affect any obligation or liability of a limited partner under an agreement or other applicable law for the amount of a distribution."

Last, Section 17-607(c) establishes a three-year statute of limitations for claims to recover distributions. Unlike subsections (a) and (b), Section 17-607(c) speaks to distributions generally. It also makes clear, consistent with the LP Act's contractarian approach, that parties may "otherwise agree[]."

Given the language of Section 17-607, the Favored LPs cannot invoke subsection (b) as a defense. First, Section 17-607 applies to distributions. For the reasons discussed in the preceding section, the Favored LPs did not receive a distribution. They received preferential transfers.

Second, Section 17-607(b) is not the exclusive means of challenging a distribution. It does not contain any text implying exclusivity. It rather states that "this

---

[2] *Compare* 6 *Del. C.* § 17-607 *with* 8 *Del. C.* §§ 154, 160, 170. *See generally SV Inv. P'rs, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973 (Del. Ch. 2010), *aff'd*, 37 A.3d 205 (Del. 2011); Bayless Manning & James J. Hanks, Jr., *Legal Capital* (3d ed. 1990).

18

subsection shall not affect any obligation or liability of a limited partner under an agreement or other applicable law for the amount of a distribution." Section 17-504 of the LP Act provides that "[d]istributions . . . shall be allocated among the partners . . . in the manner provided in the partnership agreement." Consequently, "the partners of a Delaware limited partnership have complete contractual flexibility to provide in a partnership agreement how distributions of cash or other assets of a limited partnership are to be allocated among the partners." Lubaroff & Altman, *supra*, § 6.5.

Rather than providing the exclusive means of challenging a distribution, Section 17-607(b) applies exclusively to a claim that a limited partnership violated Section 17-607(a). The Disfavored LPs are not claiming a violation of Section 17-607(a). They are claiming violations of the Partnership Agreement. As here, partners can enforce provisions in a partnership agreement, and Sections 17-607(a) and (b) do not prevent them from doing so. The broader coverage of the statute of limitations in Section 17-607(c) reinforces the narrower scope of Section 17-607(a) and (b).

To support the contrary proposition that Section 17-607 is the exclusive means of challenging a distribution, the defendants excise language from *Techmer Accel Holdings, LLC v. Amer*, 2010 WL 5564043 (Del. Ch. Dec. 29, 2010). In that case, a creditor sought to claw back a distribution made to a limited partner of a dissolved limited partnership. The decision predominantly analyzed Section 17-804, which governs the dissolution of a limited partnership. *Id.* at *8. In passing, the court noted that Section 17-607 did not apply once a limited partnership had dissolved. As the court explained, "[u]nder § 17–804(e), distributions made to partners by a dissolved limited partnership are exclusively

19

controlled by § 17–804, while § 17–607 governs distributions at all other times during the limited partnership's existence before dissolution." *Id.* at *7. Reading too much into this language, the defendants construe *Techmer* as holding that (i) Sections 17-607 and 17-804 are "exclusive" provisions that bar any other restrictions on distributions and (ii) Section 17-607 applies exclusively until a partnership dissolves.

That is not what *Techmar* held, nor what the LP Act provides. *Techmar* recognized that there could be "additional protective measures" against distributions that creditors or other parties could bargain for. *Id.* at *9. One obvious example is a restriction in a limited partnership agreement. In fact, Delaware law presumes that provisions in a partnership agreement are separate and independent of statutory rights:

> It is not necessary for . . . partnership provisions to include explicit language that they are creating contractual rights separate and independent of statutory rights in order for those provisions to in fact create a separate and independent contractual right. Rather, where a provision in a partnership agreement appears on its face to create a right separate and independent from a statutory right or a right granted in another section of the partnership agreement, the partnership agreement must explicitly state that the provision is merely clarifying or placing additional conditions on the other statutory or contractual right if in fact that is the provision's intended purpose. Otherwise, this Court will conclude that the parties intended the provision to create the separate and independent contractual right that the provision on its face purports to create.

*Bond Purchase, L.L.C. v. Patriot Tax Credit Props., L.P.*, 746 A.2d 842, 855 (Del. Ch. 1999). Consistent with this approach, the plain language of the LP Act makes clear that Section 17-607(a) imposes one limitation on distributions, but it is not the exclusive limitation. In this case, it is not even an applicable limitation. The Favored LPs cannot rely on Section 17-607 as a defense.

20

### 3. The Dispute Resolution Provision

In another of their secondary arguments, the Favored LPs rely on Section 10.5 of the Partnership Agreement, which they claim established a ten-day contractual limitations period for bringing claims. Because the provision is ambiguous and the underlying purpose of the provision unclear, it cannot operate at this stage to foreclose this lawsuit.

Section 10.5 of the Partnership Agreement provides as follows:

> The parties hereby agree to cooperate in good faith with each other for a period of thirty (30) days after receiving formal written notice from the party who claims a dispute has arisen to resolve any dispute whatsoever relating to the interpretation, validity or performance of this Agreement or any other disputes arising in any way out of this Agreement. To the extent such dispute is not resolved within such thirty-day period, the parties shall resolve such dispute in the venue and jurisdiction set forth in Section 10.12 hereof, *which determination shall be made* within ten (10) days following such thirty-day period.

PA § 10.5 (emphasis added). To my mind, the meaning of this provision is not clear. What is the "determination"? Is it a complete resolution of the dispute itself? That seems highly unlikely; even an expedited proceeding can rarely be determined within ten days. Is it a determination that the dispute has not been resolved within the thirty-day period? That seems most likely, as the parties may have different views about the productivity of further discussions. Is it a determination about the "venue and jurisdiction" in which to seek a determination? That seems possible, as Section 10.12 contemplates the prospect of suit in the United States District Court for the District of Delaware or in any state court in New Castle County, Delaware (making both this court and the Superior Court candidates). Or is it a time period in which suit must be filed? That seems least likely, as the filing of a suit is not a "determination."

21

The defendants, however, argue that the last possibility is the only possibility, and that Section 10.5 thus imposes a 10-day contractual statute of limitations. "Delaware law does not have any bias against contractual clauses that shorten statutes of limitations because they do not violate the legislatively established statute of limitations, there are sound business reasons for such clauses, and our case law has long upheld such clauses as a proper exercise of the freedom of contract." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *3 (Del. Ch. July 11, 2011) (Strine, C.).

> [S]tatutes of limitation are founded in wisdom and sound policy. They have been termed statutes of repose, and are regarded as highly beneficial. They proceed on the principle, that it is to the interest of the public to discourage the litigation of old or stale demands; and are designed not merely to raise a presumption of payment, but to afford a security against the prosecution of claims where, from lapse of time, the circumstances showing the true nature or state of the transaction, may have been forgotten; or may be incapable of explanation by reason of the uncertainty of human testimony, the death or removal of witnesses, or the loss of receipts, vouchers, or other papers.

*Keller v. Farmers Bank*, 24 A.2d 539, 542 (Del. Super. 1942) (internal quotation marks omitted). But there is a difference between a general proposition and its application to the facts of a particular case. Parties do not have unbridled discretion to shorten the statute of limitations: "Delaware decisions follow the general principle that contractual limitation of actions periods are valid if they are reasonable." *Shaw v. Aetna Life Ins. Co.*, 395 A.2d 384, 386 (Del. Super. 1978); *accord Aircraft Serv. Int'l, Inc. v. TBI Overseas Hldgs., Inc.*, 2014 WL 4101660, at *3 (Del. Super. Aug. 5, 2014).

At present, the meaning of Section 10.12 is ambiguous. To the extent that extrinsic evidence clarifies the ambiguity and demonstrates that it was intended to operate as a

limitations period, it is possible that a ten-day limitations period could be unreasonable. It seems too short to serve the goals identified in *Keller*, such as discouraging litigants from pursuing old or stale claims and ensuring that cases are brought before evidence has been lost or memories faded. Rather than protecting the courts and the public from the burden of tardily filed litigation, it seems to create the opposite problem by forcing a party to rush into court before properly investigating the factual and legal bases for its suit. In any event, the interpretation of Section 10.12 and any potential challenge to its reasonableness must await a more developed record. The provision does not establish a limitations period that can be applied at the pleading stage.

### 4. Estoppel

In a final secondary argument, and one made at best in passing, the Favored LPs suggest that the Successor GP should be estopped from bringing this litigation. They do not flesh out this theory, nor identify the species of estoppel on which they rely, and the two cases they cite do not involve estoppel but rather acquiescence. They nevertheless seem to posit that the Successor GP stands in the shoes of the Original GP, and that the Original GP could not challenge the preferential transfers because it made them.

As with the meaning of the dispute resolution provision, a ruling on estoppel is premature. Estoppel is an affirmative defense that will turn on facts that are not yet known at this stage. Regardless, assuming that the Successor GP was estopped, that defense would not extend to the Disfavored LPs, who also are entitled to enforce the terms of the Partnership Agreement. At present, estoppel does not provide a basis for dismissal.

23

**5.    The Passport Fund And The Side Letter**

The defendants' arguments up to this point applied to all of the Favored LPs. In addition, the Passport Fund has unique defenses based on the Side Letter. Those defenses can be rejected as a matter of law.

**a.    The Integration Clause**

As a threshold matter, the integration clause in the Subscription Agreement rendered the Side Letter a nullity. It stated that the Subscription Agreement "constitutes the entire understanding among the parties with respect to the subject matter hereof, and supersedes any prior understanding and/or written or oral agreements among them." SA § 7. Passport Capital and the Original GP signed the Side Letter on March 4, 2012. On March 5, the next day, Passport Capital signed the Subscription Agreement. The Side Letter was a "prior agreement" relating to the subject matter of the Subscription Agreement. The subsequent agreement therefore superseded its terms.

**b.    The Invalid Provisions**

Assuming for the sake of argument that the Side Letter remained in effect, it only could bind the Partnership to the extent that the Original GP had the necessary authority to commit to its terms. When a representative seeks to bind an entity to a contract, ordinary principles of agency law come into play. *See Penington v. Commonwealth Hotel Constr. Corp.*, 156 A. 259, 262 (Del. Ch. 1931) (Wolcott, C.).

> [I]f a principal holds out a person and places him in such a position in the community that he is apparently authorized to deal with persons as the agent of the company or person, without any known restriction or limitation upon his authority, he may be so held out as to bind the principal. And the courts in this state have well said that, if a person is held out to third

persons or to the public at large by his principal as having a general authority to act for him in a particular business or employment, he cannot limit his authority by private or secret instructions.[3]

But if an agent's authority is limited and the counterparty knows about the limitations, then the agent cannot bind the principal beyond the scope of its authority.[4]

The terms of the Subscription Agreement and the Partnership Agreement establish that the Passport Fund knew about the limitations that the Partnership Agreement imposed on the Original GP's authority. Under the Subscription Agreement, the Passport Fund agreed "to sign and become a party to the Partnership's Limited Partnership Agreement in substantially the form as accompanies this Agreement." SA § 3(l). In the Partnership Agreement, the Passport Fund represented and warranted that it had "received, read, and fully understands this Agreement, along with the Subscription Agreement and the Confidential Private Placement Memorandum in connection with his investment in the Partnership and acquisition of Limited Partnership Interests therein."

---

[3] *Excelsior Ref. Co. v. Murphey*, 73 A. 1040, 1040 (Del. Super. 1906); *accord In re Mulco Prods., Inc.*, 123 A.2d 95, 106 (Del. Super. 1956), *aff'd sub nom.*, *Mulco Prods., Inc. v. Black*, 127 A.2d 851 (Del. 1956).

[4] *Cohen v. Home Ins. Co.*, 97 A. 1014, 1017 (Del. Super. 1916) ("No rule is better settled than where a limitation on the power of an agent is brought home to the person dealing with him, such person relies upon any act in excess of such limited authority at his peril.") (internal quotation marks omitted), *aff'd*, 111 A. 264 (Del. 1920); *see State v. Edwards*, 1995 WL 44267, at *4 (Del. Super. Jan. 31, 1995); *Arthur Jordan Piano Co. v. Lewis*, 154 A. 467, 469 (Del. Super. 1930). *See generally* Restatement (Second) of Agency § 49 cmt. b (1958) ("[I]f the principal manifests to the third person that the agent is authorized to conduct a transaction, there is apparent authority in the agent to conduct it in accordance with the ordinary usages of business and to do the incidental things which ordinarily accompany the performance of such transaction, unless the third person has notice that the agent's authority is limited.").

PA § 3.4; *see also* PA § 2.2 (providing that the "General Partner shall require any Person acquiring Partnership Interests to, prior thereto or contemporaneously therewith, enter into and agree to be bound by this Agreement, and in no event shall any Person be deemed to be a Limited Partner until such person has entered into and is bound by this Agreement").

Under the Partnership Agreement, the Original GP lacked authority to grant the Passport Fund many of the rights that the Side Letter purportedly provided. Most significantly for present purposes, the Original GP could not grant the following rights that appeared in paragraph 8:

> Allocation of Shares. The parties hereby agree that the allocation of the Facebook shares ("Shares") . . . and the corresponding percentage allocation of the Shares shall be as follows and no action shall be taken by the Partnership or General Partner that serves to dilute the number of Shares held by the Investor:
>
> Investor: 22.11%, which, for the avoidance of doubt, will be reflected accordingly in the Investor's Capital Account as the indirect ownership of 100,000 Shares at $33 per share
>
> Other Limited Partners: 77.89%,
>
> General Partner: 0.00%.

Side Letter ¶ 8.

By its terms, paragraph 8 purported to provide that the Passport Fund "held" a specific number of Facebook shares. But the Original GP lacked authority to grant the Passport Fund an ownership interest in specific partnership property in light of Section 17-701 of the LP Act, the Limited Purpose provision (PA § 1.4), the Partnership Interest Provision (PA § 1.7), the Entity Ownership Provision (PA § 1.8), and other provisions of

26

the Partnership Agreement (*see* PA §§ 3.4, 10.8). Having agreed that it knew about the contractual limitations on the Original GP's authority, and being presumed as a matter of law to know about the statutory limitation, the Passport Fund cannot claim that the Side Letter conferred this right.

Paragraph 8 also purported to provide the Passport Fund with a specific and fixed percentage interest in the Partnership. But the Original GP lacked authority to grant this right as well, both in light of the provisions defining and governing the calculation of a Percentage Interest (PA §§ 1.1 sched. B, 1.7), and the other provisions that relied on that calculation (PA §§ 1.6, 4.1-4.4). This aspect of paragraph 8 also conflicted with the provisions in the Partnership Agreement governing a partner's capital account. Contrary to what the Side Letter envisioned, a limited partner's capital account was not an escrow account in which the General Partner could park shares tagged for a preferential transfer. It was a set of accounting entries used to track the limited partner's net investment in the Partnership. *See* PA § 2.4(a).

The provisions of the Partnership Agreement that paragraph 8 sought to override were mandatory and inured to the benefit of the Partnership and all of its partners. The Partnership Agreement did not authorize the Original GP to waive those provisions or grant rights that ran contrary to them. The other limited partners were entitled to enforce the terms of the Partnership Agreement as written, and any contrary commitment that the Original GP purported to make was not binding on the partners who did not sign the Side Letter. *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 343 (Del. Ch. 2003) ("[O]nly parties to a contract are bound by that contract.").

27

In this regard, the rights purportedly granted in paragraph 8 differed from other provisions of the Side Letter in which the Original GP agreed to exercise a discretionary power in favor of the Passport Fund. For example, a provision in the Side Letter stated that the General Partner would not enforce against the Passport Fund the prohibition in the Partnership Agreement against assignments of limited partner interests. The Partnership Agreement authorized the General Partner to consent to assignments, so the Original GP had the power to grant the waiver that the Passport Fund requested. As to areas where the General Partner lacked authority, however, the Passport Fund could not secure a contrary right without an amendment to the Partnership Agreement. The Side Letter recognized that at least one of the rights it wanted—the ability of 65% of the limited partners to remove the General Partner—required an amendment. *See* Side Letter ¶ 15. So did the rights purportedly granted in paragraph 8.

The Original GP could not use the Side Letter to amend the Partnership Agreement unilaterally. Section 10.7 of the Partnership Agreement provided that any amendment that "would materially and adversely change the specifically enumerated rights or duties of a party or of a class of parties" must be approved by a majority of the adversely affected partners. PA § 10.7. Without the required approval, the purported amendment was ineffective. Although the Passport Fund attempted to argue that the provisions of the Side Agreement on which it relied did not "materially and adversely change the specifically enumerated rights" of the Partnership or the other limited partners, that position is frivolous. In contrast to the provisions of the Partnership Agreement as a whole, which envisioned all partners enjoying gains or suffering losses in

28

proportion to their Percentage Interests, paragraph 8 of the Side Letter sought to insulate the Passport Fund from any downside by fixing its right to a specific number of Facebook shares. By protecting the Passport Fund, the Side Letter tried to shift its share of any losses onto the other investors.

Ironically, the first paragraph of the Side Letter recognized the detrimental effects of investor-specific side letters on non-signatory limited partners by requiring that (i) the Partnership inform the Passport Fund of any future side letters and (ii) grant the Passport Fund the option of receiving most-favored-nations treatment. The full paragraph stated:

> Side Letters. Neither the Partnership, the General Partner nor any of their respective Affiliates has entered into any side letter or similar agreement with any investor in the Partnership in connection with the admission of such investor to the Partnership as a Limited Partner (a "Side Letter") on or prior to the date hereof, except as disclosed to the Investor in writing on or prior to the date hereof. Neither the Partnership, the General Partner nor any of their respective Affiliates will enter into a Side Letter with an existing or future investor in connection with the admission of such investor to the Partnership after the date hereof that has the effect of establishing rights or otherwise benefitting such investor (in its capacity as a Limited Partner) in a manner more favorable in any material respect to such investor than the rights and benefits established in favor of the [Passport Fund] by the Partnership Agreement or pursuant to this letter agreement unless, in any such case and except as provided below, the [Passport Fund] has been offered in writing the opportunity to receive the same rights and benefits granted under such Side Letters to the extent that such rights and benefits may be fairly and reasonably applied to the [Passport Fund].

Side Letter ¶ 1. In other words, the Passport Fund did not want anyone else doing to it what it was doing to the other limited partners, or at least not without the Passport Fund getting the same sweetened deal.

The Passport Fund has pointed to two other provisions that it claims authorized the Original GP to grant it special rights. One is Section 1.9 of the Partnership Agreement, which authorizes the Partnership and the General Partner to pursue transactions involving conflicts of interest, including by conducting business with individual limited partners. PA § 1.9. That provision does not contemplate granting specific limited partners special rights. It instead permits the General Partner to contract with limited partners in alternative capacities, such as if a limited partner loaned money to the Partnership in addition to purchasing limited partner interests. The Passport Fund did not conduct other business with the Partnership. It purchased Units like any other limited partner.

The Passport Fund also points to Section 2.2 of the Partnership Agreement, which authorizes the Partnership to issue "Partnership Interests, rights, options, or warrants exercisable for or convertible into Partnership Interests, or other securities or instruments of any type of class whatsoever," and it provides that those securities can be issued for "cash, property, services, or such other type, form, and amount of consideration (including notes, other evidences of indebtedness or obligations of the person acquiring the interest, instrument, or security, as the case may be) as the General Partner may determine to be appropriate." PA § 2.2(a). While that provision authorizes the General Partner to create new types of securities with different rights, it does not authorize the General Partner to give certain purchasers of Units special rights that other purchasers of Units do not enjoy. In this case, the Passport Fund purchased Units. It did not purchase a different Partnership security. In any event, Section 2.2 provides that "the General Partner shall require any Person acquiring Partnership Interests to . . . enter into and agree

30

to be bound by this Agreement, and in no event shall any person be deemed to be a Limited Partner until such person has entered into this Agreement," and it also states that the General Partner's ability to issue securities is "subject to the express requirements hereof." *Id.* § 2.2(b); *accord* PA 3.3(b). In other words, Section 2.2(b) does not empower the General Partner to use the issuance of a new security to circumvent a mandatory aspect of the Partnership Agreement.

Paragraph 8 of the Side Letter could not give the Passport Fund the rights that it claims. The integration clause in the Subscription Agreement wiped out the Side Letter, which could not confer super-limited-partner status on the Passport Fund in any event.

## B.     Count II: Conversion

Count II asserts a claim for conversion. Conversion is an "act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933). Conversion does not require a "'subjectively wrongful intent' to be actionable"; a defendant motivated by a mistaken belief may be held liable. *Segovia v. Equities First Hldgs., LLC*, 2008 WL 2251218, at *19 (Del. Super. May 30, 2008). To state a claim for conversion, a party must allege that (i) it has a property interest in the allegedly converted property; (ii) it had a right to possession of the property; and (iii) the defendants wrongfully possessed or disposed of such property as if it were their own. *Israel Disc. Bank of N.Y. v. First State Depository Co.*, 2013 WL 2326875, at *19 (Del. Ch. May 29, 2013).

The Complaint states a claim for conversion. The Disfavored LPs had a property interest in the Facebook shares that were transferred to the Favored LPs, at least to the

31

extent that the number of shares transferred exceeded each Favored LP's respective Percentage Interest. If a distribution had been made properly in compliance with the Distribution Provisions, then those Facebook shares would have gone to the Disfavored LPs. Instead, the shares went to the Favored LPs, who have treated them as if they were their own.

The Favored LPs make the same arguments in response to Count II that they advanced in response to the breach of contract claim in Count I. Those arguments fail for the same reasons. They also argue that the Disfavored LPs should not be permitted to sue both for breach of contract and for conversion. The Disfavored LPs can plead in the alternative, as they have done. *See* Ct. Ch. R. 8(e)(2).

## C. Count III: Unjust Enrichment

Count III asserts a claim for unjust enrichment. "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). "Restitution is permitted even when the defendant retaining the benefit is not a wrongdoer." *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999). The Favored LPs make the same arguments in response to Count III that they advanced in response to Counts I and II. Those arguments fail on the same grounds.

## D. Count IV: Declaratory Judgment

Count IV of the Complaint asserts a duplicative claim for a declaratory judgment regarding the meaning of the disputed provisions of the Partnership Agreement. Under

32

the Declaratory Judgment Act, the court has the power to "construe" the Partnership Agreement and declare the parties' respective "rights, status or other legal relations thereunder." 10 *Del. C.* § 6502. The court may also provide supplementary relief "whenever necessary or proper" to resolve the parties' dispute. *Id.* § 6508. Supplementary relief may include damages for past breaches. *Sullivan v. Local Union 1726 of AFSCME, AFL-CIO*, 464 A.2d 899, 903 (Del. 1983). The court has to make the necessary determinations in the course of resolving the claim for breach of contract. Because the declaratory judgment count does not add anything, it is dismissed. If for some currently unforeseeable reason it turns out later that the declaratory judgment claim was not superfluous, it can be reinstated without any prejudice to the defendants.

### E.     Who Is The Proper Plaintiff?

The defendants last argue that only the Partnership, not the Disfavored LPs, can bring the claims set forth in the Complaint. They combine this argument with assertions about why the Successor GP was not properly elected and therefore cannot sue itself or cause the Partnership to sue. By making these arguments, the Favored LPs hope to put off the day when suit can be brought against them.

The claim for breach of contract alleged in Count I is a cause of action that the Disfavored LPs can assert in their capacity as limited partners. The Disfavored LPs are parties to the Partnership Agreement and so can assert a claim for breach. *See Allen v. El Paso Pipeline GP Co., L.L.C.,* 90 A.3d 1097, 1110 (Del. Ch. 2014).

The claims for conversion and unjust enrichment have dual aspects. *See In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, --- A.3d ---, 2015 WL 7758609, at *24-25 (Del.

33

Ch. Dec. 2, 2015). Assuming that these claims are treated appropriately as derivative for pleading-stage purposes, the Disfavored LPs can proceed with this lawsuit.

In asserting their proper-plaintiff argument, the defendants have posited two alternatives. Either the Successor GP was validly elected to fill a vacancy created when the Original GP resigned, or the Successor GP was not validly elected and there is currently no General Partner. If the former scenario is true and the Successor GP was validly elected, then the Successor GP's presence in the case demonstrates its support for the litigation, which therefore can go forward. *See In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 808 (Del. Ch. 2009) (Strine, V.C.). The concepts of demand and demand futility, and indeed derivative actions in general, operate to benefit the entity, and do "not [operate] for the benefit of defendants." *Id.* When the authoritative decision-maker for the entity does not object to investors pursuing a claim, they can proceed. *See Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 731 (Del. 1988).

If the latter scenario is true and the Successor GP was not validly elected, then this litigation again can go forward. In that scenario, there is currently no General Partner who can cause the Partnership to sue. Consequently, "an effort to cause [the General Partner] to bring the action is not likely to succeed." 6 *Del. C.* § 17-1001.

## F. Passport Capital

The Complaint names Passport Capital as a defendant, but it is not clear why. The foundation for potential liability in this case is the Favored LPs' receipt of Facebook shares exceeding what they should have received based on their Percentage Interests in the Partnership. Passport Capital is not a Favored LP. It manages the Passport Fund.

34

The Complaint alleges that Passport Capital received Facebook shares, but that is not a reasonable inference to draw at this stage. Because of Passport Capital's role vis-à-vis the Passport Fund, the reasonable inference is that the Passport Fund received the shares, and that the Passport Fund paid management fees to Passport Capital and made distributions to its investors that benefitted Passport Capital through a carried interest or similar incentive compensation structure. Another reasonable inference is that the amount of fees and incentive compensation that Passport Capital received took into account the performance of the Passport Fund's investment in the Partnership. That is a different thing, however, than being a party to the Partnership Agreement and receiving Facebook shares in violation of the provisions set forth in that agreement.

Depending on the fruits of discovery and the outcome of the case, it is possible that the Disfavored LPs might have a claim against Passport Capital. If the plaintiffs prevail on the merits, and if the Passport Fund is not able to satisfy its share of liability for the plaintiffs' claim, and if at that point it appears that excess Facebook shares or the proceeds from a sale of those shares reached Passport Capital, then some form of disgorgement or other remedy might be appropriate. But at present it is not reasonably conceivable that a claim exists against Passport Capital, rather than the Passport Fund.

The Complaint also alleges that Passport Capital entered into the Letter Agreement on behalf of the Passport Fund and that Passport Capital subsequently executed the Subscription Agreement on behalf of the Passport Fund. The Complaint does not contain allegations suggesting grounds why Passport Capital would face liability because of these acts.

To the extent the Complaint asserted claims against Passport Capital, the motion to dismiss is granted. Passport Capital is dismissed from the case.

## III.    CONCLUSION

Count IV is dismissed as redundant of Count I. All claims against Passport Capital are dismissed. Otherwise, the motion is denied.